**UNITED STATES of America**

v.

**Ricardo E. RIVERA et al.**

**Crim. No. 3–79–190.**

United States District Court,
N. D. Texas,
Dallas Division.

Jan. 11, 1980.

William M. Ravkind, Dallas, Tex., for Redmon and Baker.

Ernest W. Kuehne, Jr., Dallas, Tex., for Hunter, Maull, Pugh and Baker.

Michael Rodgers, Tim K. Banner, Dallas, Tex., for Blair.

Dan Alfaro, Corpus Christi, Tex., for Esteban Rivera and Lopez.

Gene Garcia, Corpus Christi, Tex., for Tiofilo Garcia, Hernandez-Pineda, Gonzalez and DeLeon.

Dan C. Guthrie, Jr., Asst. U. S. Atty., Dallas, Tex., for plaintiffs.

## ORDER ON MOTIONS TO SUPPRESS

PATRICK E. HIGGINBOTHAM, District Judge.

All defendants seek suppression of evidence seized when their respective vehicles were seized and searched by DEA agents in the early morning hours of September 22, 1979, as they departed a 55-acre farm located in Kaufman County, Texas. They also seek suppression of a large cache of marijuana found on the farm premises. Because all defendants are similarly situated for purposes of these motions to suppress, and make similar arguments, they will not

be separately referred to except where necessary to the context or when their situations differ in a pertinent way.

Because, as will be seen, the seizure at the farm was pursuant to an issued warrant and the arrests and the search and seizure of the vehicles as they left the farm were without a warrant, there are at the outset two distinct problems. The first is whether the warrant was validly issued and executed. The second is whether the warrantless arrests and searches and seizures were valid. The second question has a critical subpart, namely the legality of warrantless searches of certain parcels found in the seized vehicles.

■ The court finds the warrant to have been validly issued upon a demonstrated and plain record sufficient to support probable cause. The seizure of the marijuana from a building on the farm was proper beyond serious cavil. Because, however, there is a colorable contest of the warrantless arrest and search of the vehicles as they left the farm and an acute problem with regard to the search of parcels found in the vehicles, the events of the morning of September 22, 1979, must be closely examined.

### Prelude

As set out in the warrant supporting the search warrant, for over a two-year period before September 22, 1979, DEA had obtained information that defendant Billy Redmon was bringing large quantities of marijuana to the Dallas-Fort Worth area using a large trailer with a large mounted gas tank. DEA knew that in January, 1977, the farm, called the Hulett-Redmon farm, had been purchased by Hulett-Redmon, Inc. The phone number at the farm and the farm ownership were traced through corporations to defendant Redmon. On September 20, a large tank truck as earlier described arrived on the farm. It was registered to the defendant Rivera. Without recounting the full details, through other activity and information from informants (recited in the 47 paragraphs of the 12 page affidavit supporting the warrant),

the DEA obtained a search warrant on September 21, 1979. In the early morning hours of September 22, a large number of law enforcement officials had the farm under surveillance, with the aid of nightscopes and under the direction of Special Agent Clifton of the DEA.

### The Morning of September 22

■ Agent Clifton set up a command post about one mile south of the Hulett-Redmon farm in a motor home. The motor home was equipped with radios enabling Clifton to communicate with other agents located at different vantage points. Agent Clifton saw, with the nightscope, vehicles entering the farm and being loaded with parcels. Clifton could not identify any persons nor identify the specific makes of the vehicles. Other agents by radio could identify the vehicles by year and model and relayed that information to Clifton. As the vehicles left the farm, at different times and in different directions, Clifton gave orders to arrest. Other agents aided with the description of the vehicles, and made the arrests, usually within miles of the farm. Even those vehicles arrested some miles away were followed by their headlights and radio communication among the officers. There is little question but that Clifton had probable cause to issue the arrest orders, and defendants do not seriously argue otherwise. Nor does the fact that because some of the vehicles were up to 10 miles away before being stopped cause difficulty. Counsel (particularly counsel for Redmon) argue that because the vehicles were of a common type and on a public highway, there was no probable cause to stop them because nothing focused on those vehicles in particular. The facts are to the contrary. The arrests occurred in predawn hours in a rural area of Kaufman County. The vehicles were under virtually constant surveillance from their departure from the farm to their arrest. While the description of the vehicles to be stopped was no more specific than a Chevrolet car or Ford sedan or pickup truck or Cadillac, under these facts such descriptions were in actuality quite specific.

Agent Clifton testified that no other vehicles passed his checkpoint near the times the various suspect vehicles were seen to leave. The police officers had probable cause to stop the vehicles, arrest the occupants, and search the vehicles. *See United States v. Agostino*, 608 F.2d 1035 (5th Cir. 1979). The rub comes from the fact that the marijuana in the vehicles was found in separate parcels.

Through the point that the vehicles were stopped and searched, the officers were on solid legal footing. After making the arrests and transporting the defendants to jail, the officers removed all the vehicles to a local churchyard. The parcels were found in the trunks of the various vehicles and opened at the churchyard. When the parcels were opened, the vehicles from which they were taken were in the complete control of DEA, distant in time and place from the arrest. Moreover, the defendants, if not already there, were on their way to jail.

### The Specific Vehicles

#### 1. Ford LTD Sedan.

Agent Clifton testified that this vehicle was observed entering the Hulett-Redmon farm property on September 22, 1979. The sedan parked near the residence located on the property and parcels, or what at night under the nightscope appeared to be bundles, were placed in its trunk. Clifton could observe the image of the vehicle through his infrared nightscope. After the bundles were placed in the Ford, it was observed leaving the farm, heading north on a dirt road. The time was around 4:00 a. m. Clifton could see that there were no other vehicles in the direction in which the Ford was leaving for at least two miles. Clifton observed the Ford through the nightscope for approximately 3½ miles as it entered State Highway 243. The Ford was ultimately stopped 10 to 15 miles from the farm and the driver, Lorenzo Pugh, was arrested. Agent Clifton gave the arrest order, followed the car with his nightscope, received radio broadcasts that the vehicle was in sight and received a radio report of the arrest. He later observed the vehicle at the churchyard where the impounded vehicles were taken immediately after the arrests. After seizing the vehicle, the officers discovered the trunk was bowed, leaving a gap on either side of the trunk lid. Parcels were later taken from the trunk of the car and searched.

#### 2. 1974 Chevrolet Impala and 1974 Buick Riviera.

These two vehicles were observed arriving at the farm at approximately 3:30 a. m. on September 22, 1979. Both parked near the residence. The trunk of each was opened and parcels were placed into the trunks of each vehicle. Sometime between 3:30 a. m. and 4:30 a. m., Agent Clifton saw the two cars leave the farm on a dirt road heading west. This information was broadcast on the radio and the officers in the area were instructed by Clifton to arrest the occupants of each vehicle. Defendant Redmon was the sole occupant of the 1974 Chevrolet and was arrested. The vehicle was seized, the trunk was opened, and several parcels of black polyethylene were observed. In about 10 minutes there was a radio broadcast that the 1974 Buick was also stopped, the occupant, Clifton Blair, arrested, and the vehicle seized. The trunk was opened and the parcels were observed.

#### 3. Black 1969 Chevrolet.

This vehicle was also observed arriving at the Hulett-Redmon farm and parking near the residence on September 22, 1979. Parcels were placed in the trunk of the car and the vehicle left the farm property on Highway 243 heading north. Officers stopped the car, arrested the sole occupant, Jeffrey Baker, checked the trunk, and discovered similar parcels.

#### 4. Maroon Chevrolet Pickup.

This pickup was observed by officers when it arrived on September 21, 1979, at approximately 9:00 p. m. It parked near the residence located on the farm and left the farm and went to property a few miles east of the Hulett-Redmon property. It was seen returning to the farm and enter-

ing the large barn located on it. There it remained for approximately two hours. It then parked near the residence in the vicinity of other vehicles. Parcels were taken from the pickup and placed in the trunk of another vehicle. The pickup left the farm property in an easterly direction on a dirt road. Clifton then got into his own vehicle, left the command post, and found the pickup coming off a dirt road onto Highway 243. It was out of his sight for less than 10 minutes. He and a police sergeant followed the truck and stopped it approximately three miles from the farm. The driver, Calvin Hunter, and a passenger, Kelvin Maull, were placed under arrest. Black parcels in the bed of the pickup truck were observed.

### 5. *Blue and Silver Ford Pickup.*

This vehicle was observed arriving at the farm on September 21, 1979, in the evening hours. During the course of the evening, it was observed entering the barn for periods of time and also going to the same property east of the Hulett-Redmon farm to which the maroon Chevrolet pickup traveled. The blue and silver pickup was also seen parked by the residence. Around 5:30 in the morning surveillance officers radioed Clifton that this pickup was leaving and gave him the direction it was traveling. Clifton and other officers then set up to intercept it as it came onto Highway 243, and were successful in doing so. The driver, Jose Gonzalez, the middle passenger, Aurelio Hernandez-Pineda, and the window passenger, Arnold Serna DeLeon, were arrested and debris appearing to be marijuana was observed in the bed of the truck. The vehicle was then seized.

### 6. *Gold Cadillac.*

Officers observed this car arriving at the farm on September 21, 1979, at approximately 6 p. m., and parking near the residence. On the morning of the 22nd, not having seen the gold Cadillac emerge from the farm, officers entered the property and located the car heading toward the residence. The vehicle was stopped and the sole occupant, Jacinto Obregon, was arrested. The trunk was opened and some seeds and marijuana debris are claimed to have been observed.

### The Parcels

None of the bags or parcels were removed from any of the seized vehicles until later that day. Then the parcels were labeled and core samples were taken from each parcel by sticking a knife through the plastic and cutting a section out of the bag. The bags, which were ordinary black polyethylene garbage bags, each contained several brick-shaped packages wrapped in Mexican paper or wallpaper. Some of the bags had small tears in them and some stems could be seen through the holes. Some were wrapped tightly and the outline of brick-shaped objects could be seen. The bags were taped shut in such a secure fashion that the DEA did not open them, but cut through the bags with a knife. Some apparently had no tears and the shape of their contents could not be observed.

■ There is no evidence of which vehicle had bags of which description or which bags emitted an odor. It is the government's burden to prove justification for this warrantless search. As will be seen, whether the contents of a bag could be seen or whether its contents were plainly revealed by its odor is important to the legitimacy of its search. The government proof leaves the case in a posture whereby the motion to suppress must be granted as to all parcels if the search of the fully sealed bags, whose contents are not even hinted at by their odor or appearance, is invalid. That is, the analysis which follows must proceed upon that assumption, the argument of plain view or plain smell having been effectively eliminated by the failure to prove which bags of which description were seized from which vehicles. Moreover, this deficiency of proof affects the analysis in a second way. In examining the reasonableness of any expectation of privacy, we cannot simply assume that a given vehicle had one bag fully sealed and another whose contents were partially revealed and were arguably

in plain view, or that using a container with a small tear lowered the expectation of privacy. Finally, as will be seen, whatever the role of "plain smell," this record is too factually anemic for its application.

On October 5, 1979, agent Clifton returned to the impounded vehicles, which had been placed under 24-hour guard, and vacuumed each car, using the same vacuum cleaner but different bags, to obtain the marijuana seeds, stems, and debris which were claimed to have been previously observed.

### Warrantless Searches of Packages and Parcels

In *United States v. Chadwick*, 433 U.S. 1, 15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977), the Supreme Court instructed that

warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the "search is remote in time or place from the arrest"; *Preston v. United States*, 376 U.S. [364], at 367, [84 S.Ct. 881, at 883, 11 L.Ed.2d 777], or no exigency exists. Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

There the Court was reviewing a warrantless search of a locked footlocker that at the time of arrest had just been placed into the trunk of an automobile. Rejecting arguments that the Court's reasoning in automobile search cases ought to be applied, the Court made plain that the analytical fulcrum to be used is the expectation of privacy in the parcels to be searched. The expectation of privacy in the footlocker was not diminished as with an automobile, which "seldom serves as one's residence or as the repository of personal effects . . . ," which has a plain view character, the function of which is transportation, and which is subject to numerous state inspection laws.

The Fifth Circuit in *United States v. Johnson*, 588 F.2d 147 (5th Cir. 1979), held invalid a warrantless search of a duffel bag seized from an aircraft on a runway and searched some 45 minutes after the defendants had been arrested. The court noted that there was probable cause to search because:

marijuana seeds had been found in the car at the border, the trunk from which the duffel bag had been removed smelled of marijuana, and suspected marijuana wrappings could be seen through a tear in one of the suitcases.

588 F.2d at 150. The court observed also that while the odor of marijuana provided probable cause to search, a warrant was nevertheless required. Finally, the court expressly found that *United States v. Soriano*, 497 F.2d 147 (5th Cir. 1974) (*en banc*), had not survived *Chadwick*. *Soriano* had upheld the warrantless search of a suitcase removed from the trunk of a taxicab as a valid automobile search. Not all the circuits reached the same result. *See United States v. Ochs*, 595 F.2d 1247, 1254 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979).

The most recent explication by the Supreme Court of this difficult area was in *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), striking down a warrantless search of a suitcase seized from the trunk of a taxicab when defendant was arrested as he departed an airport. While there was "ample probable cause for the police officers' belief that contraband was contained in the suitcase," there was no "exigent circumstance justifying the officers' failure to secure a warrant for the search of the luggage." *Id.* at 756, 99 S.Ct. at 2589. The Court rejected the argument that the "automobile exception" of *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) (the predecessor to this circuit's *Soriano* analysis), was applicable. The Court reasoned that

because each exception to the warrant requirement invariably impinges to some extent on the protective purpose of the

Fourth Amendment, the few situations in which a search may be conducted in the absence of a warrant have been carefully delineated and "the burden is on those seeking the exemption to show the need for it. . . ."

442 U.S. at 759, 99 S.Ct. at 2591. In sum, the Court in *Sanders* made plain that the Fifth Circuit in *Johnson* was sound in rejecting the argument that *Soriano* survived *Chadwick*. Moreover, it plainly restated the old principle that it is the government's burden to bring itself within an exception to the warrant requirement. Without attempting to catalogue the exceptions to the warrant requirement, none were present here when the sealed bags taken from the vehicles were searched. Here the search was remote in time and place from the arrest scene. There is no hint that agents were concerned that the bags contained other than that which they suspected—marijuana.

It follows that the warrantless search of the bags cannot be sustained *if* the defendants had a reasonable expectation of privacy in their contents or unless it can be sustained as an "inventory search."

*Chadwick* and its offspring present inevitable and familiar linedrawing tasks as the myriad factual patterns of the cases emerge. The Court in *Sanders* noted:

Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to "plain view," thereby obviating the need for a warrant. See *Harris v. United States*, 390 U.S. 234, 236, [88 S.Ct. 992, 993, 19 L.Ed.2d 1067] (1968) *(per curiam)*. There will be difficulties in determining which parcels taken from an automobile require a warrant for their search and which do not. Our decision in this case means only that a

warrant generally is required before personal luggage can be searched and that the extent to which the Fourth Amendment applies to containers and other parcels depends not at all upon whether they are seized from an automobile.

442 U.S. at 764–765 n.13, 99 S.Ct. at 2593–2594 n.13. Justice Blackmun in dissent argued that *Chadwick* was creating difficult decisions as to the type of container requiring a warrant. That observation is, as illustrated by this case, true; but the inquiry is not a process of categorizing types of containers that may be searched without a warrant and those that may be searched only with a warrant. As will be seen, the focus is whether the search intruded upon a reasonable expectation of privacy enjoyed by these defendants. It is only in that context that the nature of the containers becomes relevant, together with all other surrounding circumstances.

### Reasonable Expectation of Privacy

The courts have as yet not developed consistency in application of, or in the concept of, the measure of the reasonableness of one's expectation of privacy. This difficulty is illustrated by the following effort of the Supreme Court to explicate the standard:

[A] "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one the law recognizes as "legitimate" . . . his expectation is not "one that society is prepared to recognize as 'reasonable.' " *Katz v. United States*, 389 U.S. [347], at 361 [88 S.Ct. 507, 516, 19 L.Ed.2d 576] (1967) (Harlan, J., concurring).

*Rakas v. Illinois*, 439 U.S. 128, 143–44 n.12, 99 S.Ct. 421, 430–431 n.12, 58 L.Ed.2d 387 (1978). First, this language does not answer the question of "legitimacy." The courts have not allowed the fruits of a search to justify its validity. To allow the elicit nature of a parcel's contents to justify

its search on the basis that its owner had no legitimate expectation of privacy would totally frustrate the policing role of the exclusionary rule. Obviously the Supreme Court did not intend that construction. Apparently what was meant is that there was no *justifiable* expectation of privacy in being where one had no right to be. That construction is consonant with the privacy values of the Fourth Amendment, calculated as they are to avoid unwarranted intrusions into privacy. The intruder in the example was the citizen, not the government. *See United States v. Gregg*, 403 F.2d 222 (6th Cir. 1968), aff'd, 394 U.S. 489, 89 S.Ct. 1134, 22 L.Ed.2d 442 (1969) (one hiding in a room not paid for has no reasonable expectation of privacy). The second question, closely related to the first, is what the relationship is between the objective standard of society's expectation of the privacy interest and the subjective expectation of the citizen. Certainly the subjective intent of the citizen as evidenced by his efforts to preserve his privacy are relevant. At the same time, a subjective expectation is alone insufficient. The expectation must be present, but its outer limit is its objective reasonableness measured by society's expectation. That expectation is, simply put, what citizens may properly expect of government.

Of course, in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), Justice Harlan attempted to deal with these concerns (only lightly touched here) explaining the reasonable expectation test:

> [T]here is a two-fold requirement, first that a person have exhibited an actual (subjective) expectation of privacy, and second, that the expectation be one that society is prepared to recognize as reasonable.

389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). The thread of this shift in focus from place of search to the expectation of persons runs through *Chadwick* and *Sanders*.[1]

### Our Facts

1. *The Subjective Expectation of Privacy.*

■ Here the defendants placed marijuana in opaque polyethylene bags. Visual examination of the bags did not reveal their content. The bags were under the cover of darkness, sealed, and placed in vehicles. In one vehicle, the bags were left in open view in the back of a pickup truck, while another vehicle's partially closed trunk left the bags partially visible. An odor of marijuana from the "bundles" was detectable.

There are no differences pertinent to the subjective expectation of privacy between a duffel bag (*United States v. Johnson, supra*) or taped cardboard boxes (*United States v. Dien*, 609 F.2d 1038 [2d Cir. 1979] rehearing, 615 F.2d 10 [2d Cir.]). That these bags are arguably not as strong for some purposes as cardboard boxes or a duffel bag, points to a lesser degree of preparation to preserve secrecy. This difference alone, however, given the precaution of selecting opaque bags and sealing them, apparently sufficiently in the case of the pickup truck and the car with the "bowed" trunk to tolerate a casual view, does not lead the court to the conclusion that the defendants had an insufficient subjective expectation of privacy. No matter how one looks at it, the inescapable and formidable facts are that the bags did have enough strength to withstand their handling. Pointedly, if they were not opened, their contents would not have been revealed, at least so far as their physical structure is concerned. Finally, the bags were secured

---

1. *Rakas, supra*, illustrates the reach of this shift in focus. How the place of a search will factor into the determination of reasonable expectancy must await the cases. It is doubtful that Justice Harlan's test is intended to be taken literally. Putting to one side the "core value" notions of one's home, expectancy contains no internal minimums or limits upon government, at least to the extent that government can defeat an expectation by its own conduct. This standard of the Supreme Court, despite its "rhetoric of empiricism" is actually a judicial statement of a perceived normative standard. *See* H. Kalven, *The Quest for the Middle Range: Empirical Inquiry and Legal Policy*, chapter 4 in Papers, American Assembly, Law in a Changing America (1968).

sufficiently that in order to check the contents, the bags were not opened, but had to be cut with a knife.

■ That there is nothing inherent in the physical properties or appearance of the bags that suggests the absence of a reasonable expectation of privacy does not, however, end the inquiry. Agent Clifton testified that although the marijuana was in sealed polyethylene bags, its odor was present.[2] In judging the reasonableness of the subjective expectation of privacy, one cannot escape the reality that placing bricks of marijuana in a black plastic bag and placing the bag in the trunk of a car or bed of a pickup hardly shields them from public knowledge if their odor is plain and identifying. The courts have long justified the seizure of articles in plain view, recognizing that there is no invasion of a reasonable expectation of privacy. The contents of a package can in some circumstances be just as effectively communicated by odor. That is, viewing all the facts and circumstances here, the bags could be argued to have been used, not to afford secrecy but solely as convenient transporting devices. *United States v. Johnson, supra* (where the odor was from the trunk from which the duffel bag was removed), or *United States v. Dien, supra* (odor was shown to be from the van, not the sealed cardboard boxes), do not preclude that argument. *See also United States v. Wilson*, 472 F.2d 901 (9th Cir.), *cert. denied*, 414 U.S. 868, 94 S.Ct. 176, 38 L.Ed.2d 116 (1973) (no expectation of privacy when door is left open); *United States v. Llanes*, 398 F.2d 880 (2d Cir.), *cert. denied*, 393 U.S. 1032, 89 S.Ct. 647, 21 L.Ed.2d 576 (1969) (talking loud enough to be heard outside of apartment).

The central premise of the "plain smell" argument, however, is that the odor of marijuana is so recognizable as to negate the expectation of privacy otherwise inferable from the use of opaque black sealed bags. There is no evidence as to the pungency of the odor. And that the odor was detectable by the trained nose of an experienced DEA agent does not diminish the expectation that the contents of the bags were shielded, even with their odor, from the general public. Nor did the government's proof specifically relate the odor to sealed bags. The only evidence of odor was the testimony of Agent Clifton that there was an odor "from the bundles." And marijuana debris, not subject to suppression, was found in some of the vehicles. We cannot, for example, simply infer that the bags in the bed of the pickup truck emitted a plain and identifying odor. Left with the one nonspecific reference to the odor of the bags the court must conclude that the case is factually indistinguishable from *United States v. Johnson, supra.*

There is little principled justification for differentiating between a revelation of content by a plain view and revelation of content by a plain odor, at least when the odor is so directly linked to the parcel and so generally recognizable that the contents of the specific parcel are revealed to a public that might be reasonably expected to encounter the parcels. The validity of that assertion, however, does not answer this case where there is no direct linkage between the odor and the searched bags and there is no showing (nor any basis for judicial notice) that the odor is recognizable by a segment of the public to which the defendants reasonably anticipated the bag might be exposed.

2. "Yes, polyethylene black plastic. However, the odor was still present from the bundles." Transcript at 129. Agent Clifton was not specific, however, as to which vehicles contained bundles bearing this characteristic odor. That inexactitude cannot be assumed to have been a mere oversight. The government was represented by experienced and able counsel. Agent Clifton has 15 years of experience and is well schooled in the legal benefits of powers of smell and detail. Nor are the courts inexperienced with this phenomenon. We cannot ignore our common experience that these bags are commonly used to contain both moisture and odor. Agent Clifton did refer to a detection of odor from the Ford LTD by the officers that stopped that car. Apart from its hearsay character, that reference was to the vehicle as in *United States v. Johnson, supra.* In the narration with regard to the other vehicles, even this type of "evidence" is missing.

### 2. Society's Expectation.

■ That these bags were used illegally to transport marijuana does not answer this inquiry. As earlier pointed out, such an approach would render legal all otherwise illegal but successful searches. Instead, the test is an objective one. The test is whether there is a reasonable expectation measured by society's expectation of government that sealed polyethylene bags with "suspicious" contents may be opened without a warrant. While the court confesses difficulty in applying this "test," it appears that the inquiry is in actuality whether there is a right to be free of government intrusion without a warrant when articles have been so placed.

■ Here, of course, we are not dealing with a usual type of luggage or duffel bag—a common repository of personal effects. But the question must answer itself. One man's garbage bag is another man's luggage. There may well be cases where the containers themselves fail the objective test. But when a container has the quality of preserving privacy and its use is not so "unusual" as to put the government on notice of a particular privacy interest, that its usage is "unusual" does not deny a privacy interest. That approach could take us down a path of categorizing containers. Otherwise stated, the usage is not so alien to custom that measured by objective standards, no right of privacy is reasonable. We do not have a case where there is a subjective interest so farfetched that government cannot be required to anticipate a reasonable claim of privacy. At this point in the analysis, we have injected an element of foreseeability (and foreseeability is present implicitly in the analysis of subjective expectations).

■ One of the inherent difficulties of search and seizure cases (primarily since *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 684, 6 L.Ed.2d 1081 [1961]) is that springing as they do from such a general constitutional text as reasonableness, their resolution is often on a discrete case-by-case factual basis. As a result, putting other problems to one side, the law enforcement officer on the street is most often given no guidance by these cases. One of the values of the analysis here is that it has the seeds of an easily understood and administered standard—if the contents of a sealed package or parcel are not revealed by the package and you have exclusive control with no fear of harm from its contents—obtain a warrant.

Law enforcement officers on seizing a sealed polyethylene bag from a vehicle can see that it is sealed and opaque. That ought to be sufficient to enable a law enforcement officer to recognize a putative privacy interest. Certainly, whether viewed as an external check on a subjective expectation of privacy in terms of its reasonableness or as part of the inquiry into what society is prepared to recognize, an inquiry into the foreseeability of a privacy claim ought not be inappropriate. That inquiry is preferable to requiring an officer to carry a list of "searchable" parcels. And with no threat to their loss of exclusive control over the parcel, law enforcement has an insufficient need to immediately search with no warrant to counterbalance the putative right of privacy. In this important sense, this expectancy of privacy is one society is prepared to recognize. Otherwise stated, the expectancy is justifiable.

Finally, the use of sealed polyethylene bags to transport matter intended to be shielded from public view does not run afoul of any general normative standard that society is prepared to recognize, such as the trespasser case in Justice Harlan's example.

### Inventory Search

No argument has been made that the opening of the bags seized from the impounded vehicles was a reasonable search because their opening was part of a prescribed DEA regimen (or even an isolated episode) of inventory. The courts have not yet harmonized the requirements of *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), and *Chadwick* and *Sanders*. *See United States v. Ochs, supra* (cases collated at 595 F.2d 1263). The

question to be answered is whether under the rationale of inventory searches there is a principled distinction between an automobile lawfully in custody and a container lawfully in possession. Possible distinctions abound and the answer is by no means simple.

There is no need to resolve this problem here, however, for the reason that the search of these bags is not even claimed to have been made in an effort to take an inventory. The search here was to obtain evidence, not to inventory, and the government, candidly and commendably, does not play the game of pretext and claim otherwise.

### Defendant Obregon

Jacinto Obregon left the farm in a 1974 Cadillac, and was promptly arrested by Agent Clifton and a sergeant Sherman. No bags of marijuana were found in the Cadillac, but Clifton recalls seeing three to five marijuana seeds and a few leaves. Later, on cross-examination, Agent Clifton stated he recalled two leaves. The leaves and seeds were not then removed. Instead, the Cadillac was impounded. On October 5, 1979, approximately two weeks after the arrest, Agent Clifton (without a warrant) vacuumed the seized vehicles, including the Cadillac. Obregon argues that this later vacuuming of the car was an illegal warrantless search because it represented a search not incident to an arrest, without exigent circumstances (the car having been impounded), and not claimed to be a taking of inventory.[3]

If this was a search and not simply a retrieval of the marijuana earlier claimed to have been observed at the arrest site, it cannot be sustained, because the government cannot bring itself within any of the narrow exceptions to the warrant requirement.

The sum of the evidence is that a gold Cadillac was stopped at night and an agent of the DEA claims to have spotted two marijuana leaves and three to five seeds in its trunk which he did not then retrieve. The agent claims that two weeks later (only after a preliminary hearing in which probable cause was found lacking as to Obregon) he took a vacuum cleaner to the impounded car, not to search, but to retrieve a total of three to five seeds and two leaves. At the same time he was retrieving (and not searching) the Obregon vehicle, he carefully vacuumed out all vehicles. The claimed reason for use of the vacuum cleaner is "there was a lot of debris in the trunk and I just didn't have time . . . to pick out which was marijuana and which wasn't . . . .." (Transcript at 160).

One cannot but wonder how, with so much debris, the DEA agent was able at night (aided apparently by a flashlight) to peer into the trunk of a car and unerringly spot two seeds and three to five leaves. The court finds the witness' recall to be materially affected by a desire to justify the warrantless search (the vacuuming) of all the impounded vehicles, including, not coincidentally, the vehicle in which no bags were found. It simply doesn't wash. The vacuuming was indeed not a retrieval of debris earlier spotted, but an illegal search.[4] Of course, even if nothing was seen at the time of the arrest, if in the course of an inventory search of the trunk, debris were in plain view, there would have been no illegal search. No such contention was made. Trunks of vehicles do not need to be vacuumed out to conduct an inventory.

---

**3.** Justice Powell's opinion in *South Dakota v. Opperman, supra,* has arguably signaled a view that any right of inventory does not extend to an opening of packages. "There is, however, no evidence in the record that in carrying out their established inventory duties the Vermillion police do other than search for and remove for storage such property without examining its contents." 428 U.S. at 380 n.7, 96 S.Ct. at 3103 n.7. Regardless, Judge Friendly's effort to read *Chadwick* restrictively and preserve a *Soriano* type analysis received a setback in *Arkansas v. Sanders, supra.*

**4.** *Cf. Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), where the Court characterized the vacuuming of an automobile to obtain, *inter alia,* microscopic particles of gunpowder as an illegal warrantless search.

### The Hearsay Argument

Redmon argues that the government has failed to prove the legality of his arrest for the reason that the only proof of the circumstances of his arrest, after Agent Clifton gave the arrest order, was the hearsay testimony of Clifton (who did not make the arrest). All defendants, except those arrested by Clifton (Obregon, Hernandez-Pineda, Gonzalez, DeLeon, and Garcia) and as to which he gave direct and competent testimony, filed motions to suppress setting out the time and location of their arrest and that the "subject contraband was seized" (". . . as he was leaving the Kaufman property" the most common allegation). A movant "in asserting an illegal arrest . . must satisfy this burden by showing that the arrest was made without a warrant. . . ." *Rogers v. United States,* 330 F.2d 535, 542 (5th Cir. 1964). At the hearing these allegations were uncontested by the government and it immediately proceeded with its evidence to justify the warrantless arrest. Thus the fact of the defendants' arrest as they left the farm is established in a competent manner.

There is no competent evidence of record that places any defendant in any particular vehicle, except for those personally arrested by Clifton and above listed. At worst this places the government in a position of defending all the arrests on a "weakest link" approach. That is, if probable cause did not exist with regard to either Redmon, Maull, Baker, or Pugh, it fails as to all because the government has not by competent evidence identified in which vehicle each was apprehended. Regardless, the stopping of each vehicle and the arrests of the vehicle's occupants was lawful. Agent Clifton testified that the parcels here at issue were removed from all the vehicles taken to the churchyard. Only the gold Cadillac and the blue and silver Ford pickup did not have parcels. Agent Clifton had personal knowledge of the seizure of the parcels from the vehicles at the churchyard and, having personally arrested the occupants of the blue and silver Ford pickup and the gold Cadillac, effectively testified which of the arrested defendants were not in vehicles without parcels.

At its best, however, all counsel through argument made plain the absence of contest as to which vehicle their client was in.

The sum of this argument is that the use of one agent to testify on all these events has caused unnecessary problems, but none are here fatal.

### Conclusion

At first blush, this decision and the decisions in *United States v. Chadwick, supra,* and *Arkansas v. Sanders, supra,* may be viewed as cutting back sharply on a police officer's power to conduct a search of personal possessions incident to and immediately following an arrest. Lest this decision be so misconstrued, a word is in order as to the much more limited nature of the result the court reaches today. Whatever the ultimate reach of the *Chadwick* and *Sanders* cases, the plain fact in the present case is that the DEA had exclusive possession and control over the seized parcels, and no reason to suspect that their contents were in any way hazardous. The application of the precedents to cases in which possession and control are less complete or the nonhazardous nature of the parcels is less than obvious or an inventory search of seized parcels is attempted, or the contents of a specific bag is revealed by the shape of its contents or its odor, must await another day. Here the DEA virtually at its leisure could have traveled the short distance from its offices to those of the United States Magistrate and obtained a warrant with little difficulty. While this warrant requirement has a technical ring, the necessity for a warrant, absent exigent circumstances, has been part of our constitutional jurisprudence since at least 1791 and the exclusionary rule part of its enforcement since *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

Having said all of this, the court remains in doubt; this is simply a close case. As stated by Erwin Griswold, search and seizure cases "involve varying degrees of differences among infinitely diverse facts."

E. Griswold, *Search and Seizure: A Dilemma of the Supreme Court* 13 (1975). The burden of the government to fit itself within the narrow confines of the exceptions to the warrant requirement tips the scales in favor of the defendants.

Therefore, the motions to suppress the parcels seized from the vehicles are GRANTED. Defendant Obregon's motion to suppress the evidence obtained from the warrantless search of his car is GRANTED. The motions to suppress the marijuana found in the building on the farm are DENIED. The court finds that the warrant was validly issued and the warrantless arrests of the defendants to have been legal and based upon probable cause.