**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Ricardo E. RIVERA, et al.,
Defendants-Appellees.**

No. 80–1115.

United States Court of Appeals,
Fifth Circuit.
Unit A

Sept. 2, 1981.

William C. Bryson, Caroline Heck, Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Ernest W. Kuehne, Dallas, Tex., for Baker, Pugh, Hunter and Maull.

Tim Banner, Dallas, Tex., for Clifton Blair.

Billy Ravkind, Dallas, Tex., for Billy Ray Redmon.

Before RUBIN and GARZA, Circuit Judges, and SUTTLE,* District Judge.

SUTTLE, District Judge.

This appeal involves review of a district court's order granting the appellees' motion to suppress evidence of core samples of marijuana cut out from sealed black plastic garbage bags. Agents of the Drug Enforcement Administration (DEA) seized these bags in the early morning hours of September 22, 1979, from vehicles being driven or occupied by various of the appellees after they had departed from a 55-acre farm located in Kaufman County, Texas.

On October 30, 1979, a grand jury for the United States District Court for the Northern District of Texas indicted the 13 appellees.[1] The first count of the indictment charged all 13 with conspiring to possess marijuana with the intent to distribute it and conspiring to distribute marijuana, in violation of 21 U.S.C. § 846. Six of the 13 were also each individually charged in respective counts (2–7) with distributing mar-

ijuana or possessing marijuana with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). Prior to trial the appellees moved to suppress, among other things,[2] evidence of the core samples of marijuana taken from the bags that had been seized from their vehicles. Calling it a "close case," Judge Higginbotham granted the motion, finding that, under *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), and *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), the DEA agents should have obtained a warrant before taking the core samples. *United States v. Rivera,* 486 F.Supp. 1025, 1036 (N.D.Tex.1980). The government appeals pursuant to 18 U.S.C. § 3731.

### I. Facts—The Fabric for Decision

In the late evening hours of September 21, 1979, Special Agent Lloyd Clifton of the DEA was directing DEA agents and other law-enforcement officers in a surveillance of the Hulett-Redmond farm in rural Kaufman County, Texas. The DEA had obtained information over a two-year period that one of the farm owners, the appellee Redmon, was bringing large amounts of marijuana into the Dallas-Fort Worth area by transporting it in a large gas tank mounted on a tractor-trailer. On September 19 such a tank truck had arrived at the farm; and on September 21 Clifton had executed an affidavit before a federal magistrate and obtained a warrant to search the farm for the large quantity of marijuana believed to be concealed there.

On the evening of September 21, Clifton worked out of a surveillance command-post in a motor home approximately one-mile south of the property. Using radio equipment, agents reported activity on the property to Clifton and received instructions from him. Clifton also watched the property himself with a nightscope, an infrared

---

* District Judge of the Western District of Texas sitting by designation.

1. At the government's request, charges were dismissed against a fourteenth indicted defendant, Jacinto Obregon.

2. Not involved in this appeal is that portion of Judge Higginbotham's order denying the suppression of a large cache of marijuana found in the warrant-search of the farm premises.

telescope that aids in seeing at night. At another surveillance point, in a hay barn about 200 feet from the observed activity, agents used a second nightscope to watch the property.

At approximately 9:00 P.M. the agents observed a maroon Chevrolet pickup arrive at the farm. After proceeding to another property a few miles east, the pickup returned to the farm. It disappeared into a large barn, where it remained for about two hours. The pickup then moved to a point near the residence on the farm.

During the early morning hours of September 22, the agents observed various cars arrive at the farm and park near the residence. The trunks of the cars were loaded with large black bundles, which were apparently being taken from the bed of the pickup. After being loaded, the cars left the farm.

As each vehicle left the farm, the agents watched its movements and relayed them to Clifton at the command-post. Because he did not want any vehicle to escape with a large amount of marijuana, Clifton directed that each of the vehicles leaving the farm be stopped and the occupants arrested. Besides the pickup, there were four cars stopped [3]—a Ford LTD sedan driven by the appellee Pugh, a 1974 Chevrolet Impala driven by the appellee Redmond, a green 1974 Buick Riviera driven by the appellee Blair, and a black 1969 Chevrolet driven by the appellee Baker. None of these cars had any passengers when they left the farm.

The agents stopped each of these five vehicles as they left the farm property. They arrested the occupants and searched the vehicles. In the trunk of each of the four cars and in the open bed of the pickup, the agents discovered numerous black plastic-wrapped bundles that are the subject of this appeal.

The bundles consisted of black polyethylene plastic garbage bags held shut with tape. Some of the plastic bags had tears through which marijuana debris and stems protruded. The more tightly wrapped bags showed the outline of packed bricks inside. Some of the bags emitted the odor of marijuana. However, the government's evidence at the hearing on the motion to suppress failed to adequately establish which vehicles had bags fitting these descriptions.

The agents did not probe the bundles further on the highway, but instead transported the arrested persons to the county jail and drove the vehicles to a nearby church parking-lot guarded by sheriff's deputies. The law-enforcement team reassembled at the church, and Clifton set up the logistics for executing the search warrant on the farm property. The agents executed the warrant, and in the course of searching the large barn they discovered several thousand pounds of marijuana.

Later that day, the bundles were removed from the vehicles and marked as to which vehicle had carried them. The bundles were kept with the bulk marijuana seized from the ranch. On September 24, samples were taken from the bundles. For each vehicle, a brick of marijuana was cut out of one bag and preserved. In addition, core samples were taken from each bag by the insertion of a knife to cut a section out of the bag.

## II. Issues—Loose Threads

The appellees moved to suppress all the marijuana seized on September 22, both from the vehicles and from the farm. Judge Higginbotham concluded that the search warrant was validly executed and that the marijuana found in the barn was properly seized "beyond serious cavil." *United States v. Rivera*, 486 F.Supp. at 1027. Further, he concluded that Clifton and the law-enforcement officers he supervised "had probable cause to stop the vehi-

---

**3.** The agents also stopped two other vehicles that contained marijuana debris but not the bundles that are the subject of this appeal. The two vehicles were a blue-and-silver Ford pickup truck driven by the appellee Gonzalez and carrying the appellees Hernandez-Pineda

and DeLeon as passengers, and a gold Cadillac driven by Jacinto Obregon, who was dismissed from the case (*see* note 1, *supra*). The stop of these two vehicles is not involved in this appeal.

cles, arrest the occupants, and search the vehicles" without a warrant. *Id.*, 486 F.Supp. at 1028. However, Judge Higginbotham granted the motion to suppress the marijuana found in the vehicles. He concluded that, although the seizure of the bags had been legitimate, the core-sampling constituted a search that was impermissible without a warrant.[4]

The government presents two major contentions on appeal: (1) the taking of core samples from cargo that was immediately apparent to be marijuana was not a search; and (2) the core-sampling invaded no privacy interest protected by the Fourth Amendment. Finding both of the government's contentions foreclosed by the recent decision in *Robbins v. California*, —— U.S. ——, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981), we affirm.

### III. Applicable Law—Unravelling the Tangled Constitutional Skein

As Justice Rehnquist once observed, the law governing warrantless searches and seizures, especially those involving vehicles, is "something less than a seamless web." *Cady v. Dombrowski*, 413 U.S. 433, 440, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973). Eight years later the courts are still trying to extricate themselves from that tangle.

█ As a general rule, a search of private property must, under the Fourth Amendment, be both reasonable and performed pursuant to a properly issued search warrant. However, a so-called "automobile exception" to the warrant requirement has been recognized. Relying on *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), in *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the Supreme Court held that it was constitutionally permissible for law-enforcement officers to conduct a warrantless search of an automobile stopped on a public highway where the officers had probable cause to believe that the vehicle contained contraband or evidence of a crime. The Supreme Court subsequently explained the

"automobile exception" to the warrant requirement in terms of a vehicle's "inherent mobility"—rather than its actual mobility—and in terms of "the diminished expectation of privacy which surrounds the automobile." *United States v. Chadwick*, 433 U.S. 1, 12, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977).

In *Chadwick*, the Supreme Court stated that it had "recognized significant differences between motor vehicles and other property which permit warrantless searches of automobiles in circumstances in which warrantless searches would not be reasonable in other contexts." *Id.*, 433 U.S. at 12, 97 S.Ct. at 2484. There, the Supreme Court held unconstitutional the warrantless search of a locked footlocker that had been removed by federal agents from the trunk of a parked automobile and taken downtown to the federal building before it was searched. Although the footlocker had been lawfully seized at the time of the arrest of its owners and although the agents had probable cause to search it, the agents' failure to obtain a search warrant rendered the search invalid. The Court rejected the government's invitation to fashion, by analogy to the automobile-search cases, an exception to the warrant requirement for personal luggage. *Chadwick* indicated that an individual had a legitimate expectation of privacy that the contents of his luggage would remain free from public examination. *Id.*, 433 U.S. at 11, 97 S.Ct. at 2483. The Court found that, unlike the situation with an automobile, an immediate search of luggage constituted a far greater interference with the rights of the owner than its seizure and indefinite immobilization. *Id.*, 433 U.S. at 13–14 n. 8, 97 S.Ct. at 2484–2485 n. 8. Absent exigent circumstances or some other exception to the warrant requirement, then, a warrant had to be obtained prior to the search of an arrestee's luggage once it came under the exclusive control of the arresting officer.

---

4. The appellees do not assert that the respective warrantless searches of the vehicles and seizure of the bags in those vehicles violated the Fourth Amendment. The only issue before us on appeal, then, is the constitutionality of the warrantless core-sampling.

The strands of confusion spun by the *Chadwick* opinion spawned *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). *Sanders* dealt with the warrantless search of a suitcase immediately after it had been seized from a moving taxicab under circumstances where law-enforcement officers had probable cause to believe that the suitcase contained contraband. Unlike the car in *Chadwick*, the taxicab was actually moving before the seizure, and not parked,[5] so that the suitcase was taken directly from the vehicle. The Supreme Court characterized the question before it as "whether the warrantless search of respondent's suitcase falls on the *Chadwick* or the *Chambers/Carroll* side of the Fourth Amendment line." *Id.*, 442 U.S. at 757, 99 S.Ct. at 2589.

The Court found that a suitcase taken from an automobile stopped on a highway is not necessarily attended by any lesser expectation of privacy than is associated with luggage taken from other locations. The Court therefore found no justification for the extension of the "automobile exception" to the warrantless search of personal luggage merely because it was located in an automobile lawfully stopped by the police. Accordingly, the Court held that the warrant requirement of the Fourth Amendment applied to personal luggage taken from an automobile to the same degree that it applied to such luggage in other locations. Thus, insofar as the police were entitled to search such luggage without a warrant, their actions had to be justified under some exception to the warrant requirement other than that applicable to automobiles stopped on the highway.

The applicability of *Chadwick* to containers other than luggage was the constitutional thread left hanging by *Sanders*. As to containers other than luggage, the Court stated:

Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to "plain view," thereby obviating the need for a warrant. See *Harris v. United States*, 390 U.S. 234, 236 [88 S.Ct. 992, 993, 19 L.Ed.2d 1067] (1968) (*per curiam*). There will be difficulties in determining which parcels taken from an automobile require a warrant for their search and which do not. Our decision in this case means only that a warrant generally is required before personal luggage can be searched and that the extent to which the Fourth Amendment applies to containers and other parcels depends not at all upon whether they are seized from an automobile.

*Id.*, 442 U.S. at 764–65 n. 13, 99 S.Ct. at 2593–2594 n. 13. Justice Blackmun, in dissent, speculated on the constitutional tangle to be generated by *Sanders*:

The Court today ... while purporting to clarify the confusion occasioned by *Chadwick*, creates in my mind, only greater difficulties ... Still hanging in limbo, and probably soon to be litigated are the briefcase, the wallet, the package, the paper bag, and every other kind of container.

*Id.*, 442 U.S. at 768, 99 S.Ct. at 2595.

Justice Blackmun's prediction concerning *Sanders'* loose ends has proved to be all too accurate.[6] The Supreme Court's most recent attempt to untangle this constitutional snarl is *Robbins v. California*, ——

---

5. Some courts had used such a fact situation to distinguish *Chadwick* and find the search of a container inside a car to be within the "automobile exception." *See*, for example, *United States v. Finnegan*, 568 F.2d 637 (9th Cir. 1977), and contrast *United States v. Stevie*, 582 F.2d 1175 (8th Cir. 1978) (en banc), *cert. de-*

nied, 443 U.S. 911, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979).

6. *See*, for example, the variety of cases cited in *United States v. Ross*, 655 F.2d 1159 (D.C.Cir. 1981) (en banc).

U.S. ——, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981).[7]

*Robbins* involved the warrantless search of a recessed luggage compartment in the rear of a station wagon. After stopping the erratically driven vehicle, smelling marijuana smoke, and finding marijuana in the passenger compartment, the policemen searched the luggage compartment and found a tote bag and two packages wrapped in green opaque plastic. The policemen unwrapped the packages and found additional marijuana. In a 6–3 decision, the Supreme Court found that the warrantless opening of the packages was constitutionally impermissible. However, the decision generates further confusion in the area of searches, as only 4 justices joined the plurality opinion— Justices Stewart, Brennan, White, and Marshall. Chief Justice Burger concurred in the judgment without giving his reasons, and Justice Powell filed a separate opinion concurring in the judgment.

Justice Stewart, writing for the plurality, rejected the notion that the Fourth Amendment protects only containers commonly used to transport personal effects. He rejected the distinction made in numerous decisions between pieces of sturdy luggage, like suitcases, and flimsier containers, like cardboard boxes. *Id.,* —— U.S. at ——, 101 S.Ct. at 2844. Referring to footnote 13 of the *Sanders* opinion, the plurality held that, "unless the container is such that its contents may be said to be in plain view, those contents are fully protected by the Fourth Amendment." *Id.,* —— U.S. at ——, 101 S.Ct. at 2846.[8]

Justice Powell summarized the plurality's holding as follows:

> The plurality's "bright-line" rule would extend the warrant clause of the Fourth Amendment to every "closed, opaque container," without regard to size, shape or whether common experience would suggest that the owner was asserting a privacy interest in its contents. The plurality would exempt from the broad reach of its rule only those "closed, opaque containers" where, because of shape or some other characteristic, the "contents may be said to be in plain view." In accordance with the plurality's usage I use the term "container" to include any and all packages, bags, boxes, tins, bottles and the like.

*Id.,* —— U.S. at —— n. 1, 101 S.Ct. at 2847 n. 1. However, Justice Powell stated that he could not join the plurality opinion because "[i]t would require officers to obtain warrants in order to examine the contents

---

7. On the same day that the Supreme Court decided *Robbins*, it also decided *New York v. Belton,* —— U.S. ——, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). *Belton* involved the scope of the "search-incident-to-arrest" exception to the warrant requirement in the context of the lawful arrest of the occupant of an automobile. In an opinion joined by five justices, the Court held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile" and consequently "may ... examine the contents of any containers found within the passenger compartment...." *Id.,* —— U.S. at ——, 101 S.Ct. at 2864 (footnotes omitted). The majority defined the word "container" as follows:

> "Container" here denotes any object capable of holding another object. It thus includes closed or open glove compartments, consoles, or other receptacles located anywhere within the passenger compartment, as well as luggage, boxes, bags, clothing, and the like. Our holding encompasses only the interior of the passenger compartment of an automobile and does not encompass the trunk.

*Id.,* —— U.S. at —— n. 4, 101 S.Ct. at 2864 n. 4. The "search-incident-to-arrest" exception is not involved in this case. However, *Belton* does establish a "bright line" rule allowing the search of any container found within the passenger compartment of an automobile when the occupant of the automobile is lawfully arrested.

8. Prior to *Robbins*, a panel of this Court reached a similar conclusion. In affirming the suppression of the contents of a closed brown paper bag found in the trunk of an automobile, the panel stated:

> We conclude ... that *Sanders* does not establish a "luggage rule" or by implication an "unworthy container" exception, but that it requires the police to obtain a warrant before searching any closed opaque container whose exterior or shape does not disclose its probable contents.

*United States v. Moschetta,* 646 F.2d 955, 958–59 (5th Cir. 1981).

of insubstantial containers in which no one had a reasonable expectation of privacy." *Id.,* —— U.S. at ——, 101 S.Ct. at 2847.

Justice Powell read *Chadwick* and *Sanders* as requiring the police to obtain a warrant to search the contents of a container "only when the container is one that generally serves as a repository for personal effects or that has been sealed in a manner manifesting a reasonable expectation that the contents will not be open to public scrutiny." *Id.,* —— U.S. at ——, 101 S.Ct. at 2849. In determining whether a defendant had manifested a reasonable expectation of privacy in the contents of a container, the court should consider

> the size, shape, material, and condition of the exterior, the context within which it is discovered, and whether the possessor had taken some significant precaution, such as locking, securely sealing or binding the container, that indicates a desire to prevent the contents from being displayed upon simple mischance. A prudent officer will err on the side of respecting ambiguous assertions of privacy, . . . and a realistic court seldom should second-guess the good faith judgment of the officer in the field when the public consequently must suffer from the suppression of probative evidence. . . .

*Id.,* —— U.S. at —— n. 3, 101 S.Ct. at 2850 n. 3. Nevertheless, Justice Powell concurred in the judgment because Robbins, "by securely wrapping and sealing his package, had manifested a desire that the public not casually observe the contents" and because "[o]ur society's traditional respect for the privacy of locked or sealed containers confirms the reasonableness of this expectation." *Id.,* —— U.S. at —— n. 3, 101 S.Ct. at 2850 n. 3.

## IV. The Law Applied—Establishing the Pattern

 In this case, pursuant to the "automobile exception" to the warrant require-

ment, the law-enforcement officers under Clifton's direction had the right to search the vehicles as they left the farm and seize the sealed plastic garbage bags from the trunks of the four cars and from the bed of the pickup truck. The same circumstances that justified the search of the appellees' vehicles also justified a warrantless seizure of the plastic bags. We must determine whether the contents of the bags seized from any particular vehicle were in plain view and, if not, whether those contents were within the protection of the Fourth Amendment.

### A. Shrouded from Plain View

The government's first contention is that the taking of core samples from cargo that was immediately apparent to be marijuana was not a search—in other words, that the marijuana was in "plain view."

 To come within the "plain view" exception, "a container must so clearly announce its contents, whether by its distinctive configuration, its transparency, or otherwise, that its contents are obvious to an observer." *Robbins,* —— U.S. at ——, 101 S.Ct. at 2847. However, as previously stated, the government's evidence in this case failed to adequately establish which vehicles had bags with tears, which vehicles had bags showing the outline of packed bricks inside, and which vehicles had bags emitting the odor of marijuana. Because the government failed to prove that marijuana was in plain view in any particular vehicle, we cannot conclude that it was in plain view in any of them. Here, as in *Robbins,* if indeed the marijuana in any of the vehicles was in plain view, "that fact was not shown by the evidence of record in this case." *Id.,* —— U.S. at ——, 101 S.Ct. at 2847 (footnote omitted).[9]

---

9. Agent Clifton was the sole witness at the hearing on the motion to suppress. Testifying as to the observations of the agents who stopped the first vehicle to leave the farm—the Ford LTD sedan—Clifton stated: "They noticed the smell of marijuana and they observed black plastic bundle type objects in the—inside the trunk." *Record,* Volume III, p. 33.

Responding to a question with respect to the bundles in the Chevrolet Impala and the Buick Riviera, Clifton replied: ". . . [I]t's possible that there may have been—some debris protruding from the plastic bags visible to the eye

The government contends that "the night of surveillance and observation of the continual loading and shipping process at the ranch enabled—indeed required—the agents to view these bundles as an integral 'job lot' of fungible cargo. That the cargo was parceled into five different vehicles did not alter the fact that on viewing and smelling the cargo and knowing from surveillance that it was all part of one shipment, it was immediately apparent to the officers that it was marijuana." *Government's Brief*, at p. 12. The government further contends that "the law officers' senses and preceding surveillance told them that they had intercepted a stream of identical objects from a larger shipping pool; the marijuana plainly protruding and wafting from some of the bundles verified the contents of the entire pool and its tributary streams." *Government's Brief*, at p. 13.

So far as we can tell, this "common-pool plain-view" theory is a novel one. However, even assuming without deciding that such a theory is an acceptable extension of the "plain view" doctrine, we find that the record in this case will not support its application.

In effect, a "common-pool plain-view" doctrine would allow a court to find the contents of a container found in one vehicle in plain view because the contents of a container found in another vehicle were in plain view. If we were to formulate the minimum requirements for the application of such a doctrine,[10] there would be at least three. The contents of a container found in a vehicle would be in plain view when: (1) the contents of a container found in a previously searched vehicle were in plain view; (2) these plain view observations are communicated to the officers who search the subsequent vehicle; and (3) it is apparent from the circumstances that the containers in both vehicles originated from a common pool.

From the record, we can say that the only one of these requirements adequately established by the government was the third. It was apparent from the circumstances that the plastic bags in all five vehicles originated from a common pool. However, the government failed to adequately establish either of the other two requirements and so failed to satisfy the minimal prerequisites

on some of them but I'm not sure of which cars." *Record*, Volume III, p. 39.

In response to a question by Judge Higginbotham, Clifton replied as follows regarding the general appearance of the bundles after their removal from the vehicles:

THE WITNESS: The bundles removed from the vehicles, Your Honor, were several brick type shaped packages wrapped in Mexican paper or wall paper that were then placed in rows and then into these large black garbage bags and then taped closed.

THE COURT: Garbage bag?

THE WITNESS: Yes, sir.

THE COURT: Looking at the bag as it was could you tell what was in it?

THE WITNESS: Not—some of the bags had tears in them where stems and debris was [sic] exposed and unless you—well, depends on the bag. The ones wrapped more tightly you could see the indentation of the various brick shaped objects but primarily like from a short—from a distances [sic] you would just see—see a black bag.

THE COURT: All the marijuana contained in a bag or was any of it loose?

THE WITNESS: Primarily it was contained in the bag. Some of the vehicles had debris that we vacuumed out.

THE COURT: Apparently from the debris were the—was the marijuana in the packages or sacks or whatever you said, garbage sacks? Tell me what you mean by bags, polyethylene plastic?

THE WITNESS: Yes, polyethylene black plastic. However the odor was still present from the bundles.

*Record*, Volume III, pp. 128–29.

At the hearing on the motion to suppress, the government produced no evidence other than these excerpts from Clifton's testimony as to the appearance of the bundles found in each particular vehicle. Of the five vehicles involved in this appeal, Clifton personally took part in only the stop of the Chevrolet pickup. For no apparent reason, the government failed to call as witnesses the law-enforcement officers who actually made the stops of the other vehicles. If these witnesses had been called and given adequate descriptions of the bundles as they appeared when the trunks of each vehicle were opened, we might have sustained the government's contention that the marijuana in each of the vehicles was in plain view.

10. We stress that we do not mean to imply that such an extension of the "plain view" doctrine would be constitutionally acceptable.

for application of any hypothetical "common-pool plain-view" doctrine.

### B. Cloaked by the Fourth Amendment

 The government's second contention is that the core-sampling invaded no privacy interest protected by the Fourth Amendment. This contention is clearly foreclosed by the decision in *Robbins*, either under the plurality's or Justice Powell's view of the law. Under the plurality's view, since the plastic bags were closed, opaque containers,[11] their contents were fully protected by the Fourth Amendment, and the bags could not be opened or "sampled" without a warrant. On the other hand, even under Justice Powell's view, the contents of these plastic bags were entitled to full Fourth Amendment protection. The bags in this case, as in *Robbins*, were opaque plastic bags that were securely wrapped and sealed.[12] Justice Powell found such containers to warrant the full protection accorded to luggage in *Chadwick* and *Sanders*.

### V. Conclusion—The Last Thread

Finding both of the government's contentions to be without merit, we AFFIRM the district court's order granting the appellees' motion to suppress and remand this case to the district court for further proceedings.

AFFIRMED.

GARZA, Circuit Judge, dissenting:

I respectfully dissent. I have no quarrel with the facts of this case as stated by the majority. My nonconcurrence in the majority opinion comes about because of my interpretation of those facts which does not agree with the interpretation given to them by the majority.

My brothers seem to give no importance to the fact that the officers who stopped the cars coming out of the Kaufman County Ranch were armed with a search warrant to search the ranch and the buildings thereon for contraband, namely marihuana.

The majority lays great stress on the case of *Robbins v. California*, —— U.S. ——, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981). I would rather lay stress on the case of *Michigan v. Summers*, —— U.S. ——, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). Footnote 4 of the majority opinion rightfully states that the appellees do not assert that the respective warrantless searches of the vehicles and seizure of the bags in those vehicles violated their Fourth Amendment rights and that the only issue before this Court on appeal is the constitutionality of the warrantless core sampling. The core sampling did not take place until after the search warrant on the Kaufman County Ranch had been executed and thousands of pounds of marihuana had been found therein near the place where the officers had seen the automobiles in question being loaded with bags. There cannot be any question that the bags from which the core sampling was done came from the ranch that had been searched pursuant to a valid search warrant.

There is no question that some of the garbage bags seized from the automobiles coming out of the Kaufman County Ranch had tears on them and that marihuana stems in plain view of the officers protruded from some of the bags. The smell of marihuana was present. The majority lays great stress on the fact that no officer testified as to which automobile had bags that had tears and showed marihuana in plain view of the officers. I ask, what difference would this make? The bags all came from the same place and if the appellees had been caught on the premises when the search warrant was executed, any container that could have held the contraband the officers were searching for could have been searched, including the garbage bags

---

11. The government failed to show that any particular vehicle contained at least one bag that was torn or otherwise disclosed its contents. Accordingly, for purposes of determining the Fourth Amendment rights of the occupant of any particular vehicle, we must assume that none of the vehicles had any bags fitting this description. *See* discussion under Subsection IV.A., *supra*, and *United States v. Rivera*, 486 F.Supp. at 1029–30.

12. *See* note 11, *supra*.

from which the core samples and the bricks of marihuana were obtained.

Instead of the core sampling being unreasonable and in violation of the Constitution in this case, I believe that it would have been unreasonable for the officers not to have taken the core samples under the facts of this case. In *Michigan v. Summers, supra,* the Court said "Because it was lawful to require respondent to re-enter and to remain in the house until evidence establishing probable cause to arrest him was found, his arrest and the search incident thereto were constitutionally permissible." I would paraphrase that holding of the Supreme Court in this case by saying that since the officers had a lawfully issued search warrant it was lawful for them to require the defendants in this case to be detained until evidence establishing probable cause to arrest and search them was found and under the facts of this case, their subsequent arrest and the search incident thereto, including the taking of core samples, were constitutionally permissible. I would not have granted the Motions to Suppress and I would reverse the Court below.