**UNITED STATES of America,**
**Appellee,**

v.

**Ronald DeBERRY and Julius Edwards,**
**Appellants.**

**Nos. 1031, 1058, Dockets 73–1283, 73–1353.**

United States Court of Appeals,
Second Circuit.

Argued July 18, 1973.

Decided Nov. 7, 1973.

Moore, Circuit Judge, dissented and filed opinion.

49

Helena P. Solleder, New York City, for appellant DeBerry.

Gilbert Epstein, New York City, for appellant Edwards.

Kenneth Kaplan, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty. for the E. D. New York, Raymond J. Dearie, Asst. U. S. Atty., on the brief), for appellee.

Before MOORE and OAKES, Circuit Judges and GURFEIN,* District Judge.

* Of the Southern District of New York, sitting by designation.

1. The right of air freight shippers to inspect all packages shipped by them is established in tariffs filed by the respective carriers or the freight-forwarding agents with the Civil Aeronautics Board (Board) pursuant to 49 U.S.C. § 1373(a). These tariffs, if valid, "are conclusive and exclusive, and the rights

OAKES, Circuit Judge:

The principal question raised on this appeal from judgments in the United States District Court for the Eastern District of New York relates to the claim of deprivation of the sixth amendment right to effective counsel by virtue of the fact that the same attorney represented both appellants below. Subsidiary questions include whether the warrantless search of a suitcase containing 25 pounds of marijuana violated the fourth amendment and whether, in the case of appellant DeBerry, the evidence established his possession of the marijuana with the intent to distribute it and whether a statement attributable to his codefendant, Edwards, was improperly admitted into evidence. The judgments convicted appellants, after a jury trial, of possessing with intent to distribute 25 pounds of marijuana in violation of 21 U.S.C. § 841(a)(1). Appellant Edwards was sentenced to a term of imprisonment of three years and a four-year special parole term; appellant DeBerry was sentenced to a term of imprisonment of two years and a three-year special parole term. A third defendant named in the one-count indictment, one Padilla, was acquitted by the jury.

An alert supervisor of Emery Air Freight Service in Los Angeles noticed that the very same individual who had shipped a suitcase to San Antonio, Texas, on May 10, 1972, proceeded to ship another suitcase to New York on May 11, 1972. The nervous behavior of the shipper had caused the supervisor to open the first bag, which he did under the official air freight rules, Tariff No. 1B,[1] whereupon he found dirty linens.

and liabilities between airlines and their passengers are governed thereby." Tishman & Lipp, Inc. v. Delta Air Lines, 413 F.2d 1401, 1403 (2d Cir. 1969). The practical effect of this arrangement is that the person shipping goods consents to the inspection of his goods by entering into the contract of shipment. The Board's involvement in these inspections —and therefore the Government's—is limited to accepting the tariffs as filed and pro-

On opening the second suitcase, however, he found 15 bricks of marijuana and thereupon called the Los Angeles Police Department. After inspecting the bag, the Los Angeles police notified Agent Raybourn at the New York office of the Bureau of Narcotics and Dangerous Drugs (BNDD) and provided him with the following information: (1) a description of the shipper; (2) the measurements and color—plaid—of the suitcase; (3) the bill of lading number of the shipment; and (4) the airline (TWA) on which the bag was to be shipped and the flight number of the flight upon which the bag was to depart Los Angeles. A BNDD agent placed the bag under surveillance upon its arrival in New York late in the afternoon of May 12. When the bag was not claimed, it was placed in a locked cage at TWA.

At 2:00 a. m. on the following day, May 13, some 24 hours after the New York BNDD had been told of the shipment and some nine hours after it had actually arrived at JFK, appellant DeBerry presented the shipper's certificate or copy of the bill of lading for the suitcase to the JFK Emery supervisor, who in turn advised the Port Authority police and New York City detectives. While the Emery supervisor went to make a copy of the receipt, DeBerry took the suitcase and left the terminal, proceeding to an automobile parked near the terminal. Upon arriving at the automobile, DeBerry was met by one of the occupants, later identified as appellant Edwards, the trunk was opened and then closed, and DeBerry and Edwards entered the automobile. At this point, the automobile was approached by Detective McKenna of the Port Authority police, who had observed DeBerry pick up the bag and had kept DeBerry under observation in the ensuing moments. A search of the vehicle was conducted and the bag was seized. A suppression hearing resulted in the admission of the bag and its contents at the trial.

An air freight service such as Emery has, in accordance with Item 24 of the Official Air Freight Rules, Tariff No. 1B, the right to inspect all shipments.[2] In addition, Tariff No. 2 of the rules and regulations of the Emery Air Freight Corporation provides that "[a]ll shipments are subject to inspection by the Forwarder." The suspicious behavior of the shipper on the preceding night when he shipped a suitcase containing dirty towels to San Antonio, Texas, was enough to give Emery Air Freight good reason to be suspicious of the shipper's action the following day in sending a suitcase to New York.

We have previously held that an inspection by a carrier is not a governmental search. United States v. Cangiano, 464 F.2d 320 (2d Cir. 1972). Here, making the case even stronger than *Cangiano*, Emery Air Freight conducted the search independently of any information or request received from government officials. We therefore accept the Government's proposition that the search conducted in Los Angeles did not infringe upon appellants' fourth amendment rights. Acceptance of this proposition does not, however, necessarily compel the acceptance of the validity of the seizure that occurred in New York.

It may be argued that the New York seizure was separate and distinct from the California search, and because there was ample opportunity for the New York officers to obtain a warrant for the suitcase's seizure, its warrantless seizure violated the fourth amendment. *See* Coolidge v. New Hampshire, 403 U. S. 443, 470–471, 91 S.Ct. 2022, 29 L.Ed. 2d 564 (1971).[3] This, however, would

---

viding a forum for challenges to the tariffs by either the Board or interested parties.

2. *See* note 1 *supra.*

3. We explicitly reject the Government's contention that to require the agents in New York to obtain a search warrant would be unduly burdensome and would therefore be controlled by this circuit's decision in United States v. Carneglia, 468 F.2d 1084 (1972). The Government's argument proceeds from the premise that "no flight number or arriv-

ignore the facts and realities of the situation. The suitcase was seized initially in California by Sergeant Figelsky of the Los Angeles Police Department. That seizure although done without warrant was legal, because Emery's legal inspection in effect put the marijuana in Figelsky's plain view; he, therefore, could seize the contraband upon sight. *Cf.* United States v. Riggs, 474 F.2d 699 (2d Cir. 1973), cert. denied, 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973). Figelsky made the seizure by removing one of the bricks of marijuana, marking all the rest of the bricks with his initials, and finally marking the suitcase itself with his initials. He then authorized the suitcase to be shipped on. Even though the suitcase was then in transit, later in the luggage bin, and later still in the freight room, it remained legally "seized" just as much as if it were under the actual physical control of the police. In fact, except for the time that it was actually in the airplane's belly, it was under the close surveillance of the police. Thus, when the agents and police in New York[4] removed the bag from the back seat of the car appellants were in, they were not making an initial seizure, but rather were merely reasserting control of the suitcase which had already been seized for legal purposes and which was merely being used as bait.[5] Accordingly, no warrant was required.

■ Appellant DeBerry also argues that there was insufficient proof that he possessed the 25 pounds of marijuana with the intent to distribute it. By his own admission, however, he and Edwards had traveled to California with the intention of purchasing the marijuana. The suitcase was shipped from California with both appellants knowing that it contained marijuana. They came to the airport to pick it up. DeBerry argues, however, that there was insufficient proof before the jury concerning his intent to distribute, as opposed to his possession for personal use. There was testimony, however, that the quantity of marijuana had a "street value" of about $8,000 and when the Government was going to call a witness to testify that 25 pounds of marijuana would not be kept for "personal use" (so as to require the charge of a lesser included offense under 21 U.S.C. § 844), defense counsel stipulated—in the jury's absence, to be sure—"that this is a large quantity of marijuana" and that it would "be assumed that this kind of quantity won't be of personal use . . . . The average person doesn't have bricks of marijuana for his own use." The judge left it to the jury, in connection with his charge on intent to give away, sell or otherwise distribute the marijuana, to make the determination whether, in the light of the quanti-

al time was communicated to Agent Raybourn" during the conversation with the Los Angeles police on May 11. Brief for Appellee at 7. The appellee's own brief, at 3, and the transcript of the trial, at 11, contradict this premise. Raybourn was told the flight number at about 2:00 a. m. New York time, and the bag did not arrive until 5:10 p. m. of that day—15 hours later. The time at which Agent Noone received notice of the arrival of the TWA flight—one hour before its arrival—is irrelevant to our consideration of whether Agent Raybourn or other officials privy to the 15-hour pre-arrival notice given by the Los Angeles police could have, with no inconvenience, obtained a warrant for the seizure of the bag in New York.

4. It is not significant that it was a sergeant from the Los Angeles Police Department who initially seized the suitcase, but the federal government which utilized it for evidence. From beginning to end the operation

was joint between Figelsky in California, agents of the BNDD in New York, and detectives of the New York Port Authority. Such cooperation and teamwork are a laudable and necessary adjunct to the nationwide attack against drugs, and it does not serve the purpose of the fourth amendment in any way to create unnecessary stumbling blocks to such cooperation. Thus this situation is clearly distinguishable from United States v. Birrell, 470 F.2d 113 (2d Cir. 1972), where documents seized legally for one purpose by the New York City Police were not returned to the owner, despite his demand, when the police had no further right to them, but rather were given to a federal prosecutor who used them to develop evidence in a wholly unrelated case.

5. *See* United States v. Doe, 472 F.2d 982 (2d Cir.), cert. denied, 411 U.S. 969, 93 S.Ct. 2160, 36 L.Ed.2d 691 (1973).

ty involved and the value of the marijuana, the appellant had such intent. That evidence together with the evidence that Edwards and DeBerry went on a three-day trip to California costing several hundred dollars in plane fare for no apparent purpose other than the purchase of marijuana is sufficient to have permitted this issue to go to the jury. Additionally the stipulation of counsel is such as to render academic the request to charge the lesser included offense, the offense of simple possession or possession for personal use under 21 U.S.C. § 844.

■ Appellant DeBerry also argues that a statement given by Edwards before the magistrate should not have been admitted in evidence against him under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Edwards, in a colloquy before the magistrate with an Assistant United States Attorney and a BNDD agent present, stated after hearing the agent's statement of the value of the marijuana that this value ($250 per brick) was "not what they paid for the material while they were there." The admission was voluntarily made in the presence of counsel and indeed the attorney told Edwards to be quiet as the statement ended. This admission is not like that in *Bruton* because DeBerry's own admissions indicated that he had gone to California with Edwards to purchase marijuana and that they did indeed make such a purchase and ship the contents in the plaid suitcase from which the bricks of marijuana were recovered. While in *United States ex rel. Ortiz v. Fritz*, 476 F.2d 37 (2d Cir. 1973), we have recently questioned the rule that permits "interlocking confessions" of codefendants to be admitted in evidence, it is nevertheless the law of this circuit. *See* United States ex rel. Catanzaro v. Mancusi, 404 F.2d 296 (2d Cir. 1968), cert. denied, 397 U.S. 942, 90 S.Ct. 956, 25 L.Ed.2d 123 (1970). There was, moreover, considerable independent evidence connecting DeBerry to the crime, including their conceded trip to California and the circumstances relative to the receipt of the suitcase from Emery as to which DeBerry signed a false name.

The point that is the most troublesome in this appeal is the fact that both Edwards and DeBerry employed the same attorney at trial; they each now argue that this violated their sixth amendment right to effective assistance of counsel. While it may be true that each of them had similar interests and were joined together as coparticipants in the crime, it also is quite obvious, as we indicated in United States v. Alberti, 470 F.2d 878, 881–882 (2d Cir. 1972), cert. denied, 411 U.S. 919, 93 S.Ct. 1557, 36 L.Ed.2d 311 (1973), that when the court becomes aware of a potential conflict of interest, the court

> should conduct a hearing to determine whether there exists a conflict of interest . . . such that the defendant will be prevented from receiving advice and assistance sufficient to afford him the quality of representation guaranteed by the sixth amendment. [And the court should] see that the defendant is fully advised of the facts underlying the potential conflict and is given an opportunity to express his or her views.

It is obvious that a situation involving potential conflict arises frequently where the same attorney is representing two defendants. Thus it is a rule of practice in at least one circuit, and we understand in a number of district courts, always to have separate counsel for each defendant. Ford v. United States, 126 U.S.App.D.C. 346, 379 F.2d 123 (1967). At the same time, this court has held that "[t]he rule in this circuit is that some specific instance of prejudice, some real conflict of interest, resulting from a joint representation must be shown to exist before it can be said that an appellant has been denied the effective assistance of counsel." United States v. Lovano, 420 F.2d 769, 773 (2d Cir. 1970). *See also* Morgan v. United States, 396 F.2d 110, 114 (2d Cir. 1968). Where no prejudice is shown the joint representation is not

impermissible. United States v. Alberti, 470 F.2d at 881.

■ We think there was prejudice shown here as to each of the defendants. It is true that Edwards and DeBerry knew each other for several years, and that in some ways Edwards was like an "uncle" to the younger man. At the trial—after DeBerry denied at the suppression hearing that he knew the name of the man who had given him $50 to collect the suitcase—DeBerry proceeded to testify on cross-examination that it was Edwards who had promised him that money. From this the Government argues that it was a "calculated strategy of both defendants" for DeBerry to shift the blame to Edwards in the hope that DeBerry would be acquitted. This strategy, if such it were, obviously might have worked to the prejudice of *Edwards*. Indeed there was a colloquy at the beginning of the second day of the trial in which the Assistant United States Attorney said that it had come to his attention that there was a possibility that Edwards would take the stand, incriminate himself and exonerate the co-defendant, which would present a "severe problem" with the same attorney representing both defendants. The attorney for the defendants said, however, that she would only put DeBerry on the stand, and the court then inquired as to whether DeBerry would testify "in any way incriminating Mr. Edwards . . . ?" The reply of counsel was, "Not as far as I know, Judge. No, sir." Of course, DeBerry did testify and incriminate Edwards, which may have been fine for DeBerry, but we fail to see how Edwards could properly have been advised to permit this to occur or to agree to it as a matter of "defense strategy" at least after DeBerry in the suppression hearing had said that he did not know who promised to give him the money to collect the suitcase. The situation cuts the other way also. Had Edwards taken the stand, which independ-ent counsel might have advised him to do, DeBerry would have been able to cross-examine him as to the statement made before the magistrate concerning the value of the marijuana which incriminated DeBerry. We say it incriminated DeBerry because, while admittedly DeBerry went to California to buy "grass," he spent his time there swimming and dancing while Edwards went out alone, and DeBerry testified that he did not buy the marijuana and that he did not know the marijuana was in the valise. As we said in Morgan v. United States, 396 F.2d at 114, the possibility of a conflict of interest is present

> especially where there is a question as to whether either or both of the defendants should take the stand. . . . The attorney's freedom to cross-examine one defendant on behalf of another will be restricted where the attorney represents both defendants. And if, where two defendants are represented by the same attorney, one defendant elects to take the stand and the other chooses not to, the possible prejudice in the eyes of the jury to the defendant who does not take the stand is almost inescapable.

Thus it seems to us that this is precisely the situation in which, as stated in *Morgan,* the trial court should have conducted the most careful inquiry to satisfy itself that no conflict of interest would be likely to result and that the parties involved had no valid objection.

■ It is true that here, on the second day of trial, at the time of the colloquy previously referred to, counsel for both defendants did assure the court that "I have explained and gone over all of the facts with both of these defendants in my office numerous times. . . . [W]e have discussed it very carefully and I have been very careful about this." Transcript at 179. This is quite another thing, however, from the court's interrogating the individual defendants, themselves.[6] It is also true

---

6. This inquiry by the district judge, however well-intentioned, is not sufficient to establish the absence of prejudice to either of the defendants. We agree with the approach of

that, at the time of sentencing, the court did conduct just such an inquiry, but by that time the damage—so to speak—had been done. Moreover, it may be assumed that neither party would have wanted to annoy the court at that stage of the proceedings.

Further indication of prejudicial conflict of interest in this case relates to the testimony of Police Sergeant Figelsky, the first witness for the Government. Counsel for defendants DeBerry and Edwards recalled Figelsky to the stand and, after stating that she wanted "the record clear that I am questioning Mr. Figelsky only as to Mr. DeBerry," and after the court stated that it felt no limitation by reason of that statement, counsel asked Figelsky how tall Mr. DeBerry was, what he weighed and how old he was, and whether the description of the man who checked the bag in Los Angeles fitted that description. She received a "no" answer. Counsel for codefendant Padilla followed the same line as to his defendant, with the same result. No one cross-examined Figelsky with respect to Edwards, and the obvious implication—from Edwards' point of view—was that he was probably the person who checked the bag. But it was his counsel who had planted this inference.

The Government argues, as we have said, that it was decided by the defendants that Edwards would serve as the "fall guy" and it was hoped that DeBerry would be acquitted. We do not know this, but even if we did, there would be all the more a conflict of interest. No one should be represented by an attorney who is making him the "fall guy" by design. To hold otherwise would open the door to many abuses going to the essentials of a fair trial. While there is perhaps less reason for saying that DeBerry was prejudiced by the joint representation, it is in the best interests of justice, we think, to reverse

and remand for a new trial as to both parties after the court has ascertained that each either has separate counsel or that, *from the beginning*, each understands clearly the possibilities of a conflict of interest and waives any rights in connection with it. We are aware from the colloquy that took place at sentencing that apparently Edwards was paying the bills for both and that accordingly defendant DeBerry may have gone along with the joint representation. However, if he is indigent, counsel can be assigned to him under the U.S.C.J.A., 18 U.S.C. § 3006A, and it is our view that only by this remand can each appellant be assured fully of the fair trial with effective assistance of counsel that the sixth amendment requires.

Judgment reversed and remanded.

MOORE, Circuit Judge (dissenting):

I dissent.

To me the majority opinion provides another example of an appellate court, in effect, substituting itself as trial counsel for the defense after having become imbued with the wisdom of hindsight.

In my opinion the majority deals correctly with most of appellants' allegations of trial error. With respect to the claim that the absence of a search warrant was critical, the majority quite properly hold that "no warrant was required." Similarly, concerning the sufficiency of the evidence adduced to prove that appellant DeBerry possessed twenty-five pounds of marijuana with intent to distribute, the majority finds that the evidence was "sufficient to have permitted this issue to go to the jury." Finally, it disposes of appellant DeBerry's *Bruton* claim, concluding that there was "considerable independent evidence connecting DeBerry to the crime." Up to this point the majority and I travel on parallel paths, both leading to affirmance. Suddenly, however, the ma-

the First Circuit that the lack of a satisfactory inquiry shifts the burden of proof on the question of prejudice to the Government.

United States v. Foster, 469 F.2d 1, 5 (1st Cir. 1972).

jority veers sharply from their path. It believes that "a potential conflict of interest existed" because "both Edwards and DeBerry employed the same attorney at trial." According to the majority, this potential for conflict violated defendants' Sixth Amendment rights and necessitates a remand.

The majority would, in effect, create a rule of law that in every criminal case in which two or more defendants are represented by the same counsel, there must be a preliminary examination by the trial court of counsel and their clients as to the possibility of conflict which would, in turn, to be effective, necessitate a full disclosure by defense counsel of counsel's defense plans and strategy. This the trial judge did not do; but *quaere,* had he done so, might not a double jeopardy situation have been created or a possible interference with defendants' Sixth Amendment rights?

In this case each defendant consciously and voluntarily chose Ms. Gerling to represent him at trial. The potential for conflict here was first noticed by the trial judge when he was apprised of the fact that in the exercise of her discretion Ms. Gerling had decided to place only DeBerry not Edwards on the stand. He questioned Ms. Gerling about the conflict problem. She replied:

> "I have explained and gone over all the facts with both of these defendants in my office numerous times. Any conflicts, and we have discussed it very carefully, and I have been very careful about this."

Such a decision would not have been unusual. One defendant might have had a long criminal record—a deterrent to putting him on the stand. The other defendant with an unblemished record might have taken the stand without this fear.

Again at the time of sentencing, the subject of conflict was reviewed and counsel said:

> "May I say this, sir, it was a problem to me also and that is why I very

carefully explained to both clients, as I said sir, both together and separately.

> \* \* \* \* \* \*

"May I say this, Judge: I have handled Mr. DeBerry's family, different members of his family, for different cases and I also know Mr. Edwards through himself and I was very, very careful but it was not to my advantage, and I say this and I think your Honor understands what I mean, it was not to my advantage to handle both of them. It meant the same to me whether I handled one of them or both of them, sir."

Not satisfied with counsel's statements, the trial judge inquired of the defendants themselves as to their awareness of a possible conflict situation. The following colloquy took place:

> "The Court: Can you tell me, did you discuss that very possibility?
>
> Ms. Gerling: I discussed that very possibility with both Mr. DeBerry, both together and separately, sir.
>
> The Court: Is that true Mr. Edwards?
>
> Defendant Edwards: Yes.
>
> The Court: Mr. DeBerry, is that true?
>
> Defendant DeBerry: That is true sir."

What more could a careful trial judge have done? He does not have the right (nor should he) to tell the defendant that he did not approve of Ms. Gerling's trial judgment and was therefore going to appoint counsel whose ideas were more in accord with his own notions of strategy. This court has held that: (United States v. Sheiner, 410 F.2d 337, 342 (1967)):

> " . . . defendants who retain counsel also have a right of constitutional dimensions to representation by counsel of their own choice . . . ; that choice should not unnecessarily be obstructed by the court."

To disapprove of the trial court's handling of this case is to call this principle

into question. As previously stated, the only course of action open to the trial judge under those circumstances would be to make inquiry as to possible conflict from both defendants' counsel and defendants themselves before the trial commences. But any such procedure would in most cases call for a complete preliminary trial because frequently the potential for conflict might not appear (even as here) until the trial was well underway. Furthermore, defense strategy might be impaired if there were such an enforced disclosure. In my opinion there can be no question of the propriety and adequacy of the trial judge's conduct in this case. Although he conducted no preliminary trial, he pursued the interests of the defendants to the limit permitted by the law as soon as he became aware of a possible conflict.

There scarcely has been, is, or will be a trial in which unsuccessful counsel will not be able to think of some tactic that in retrospect he wishes he had or had not followed. The trial and appellate courts, once they have satisfied themselves that a certain trial strategy was voluntarily chosen by defense counsel, and voluntarily approved by the defendant, must leave the steering of the trial in the hands of counsel. To apply the hindsight sagacity expounded by the majority opinion is to undermine the whole structure of our adversary system of justice. Such a holding would give all defendants, where two or more are represented by common counsel, the opportunity to claim some conflict which could easily arise or could possibly be conjured up on appeal, reducing the first trial to nothing more than a trial run.

Experienced trial counsel will probably not disagree too much with the frequently heard expression that a courtroom trial is a game—possibly so, but the game should not be akin to duplicate bridge.

I can find no error in the trial judge's conduct under the circumstances here presented and, hence, would affirm.