UNITED STATES of America,
Plaintiff-Appellant,

v.

Sandra BULGIER, Defendant-Appellee.

No. 79–2053.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 21, 1980.

Decided April 8, 1980.

Rehearing Denied April 29, 1980.

Rehearing and Rehearing In Banc
Denied May 6, 1980.

Thomas P. Sullivan, U. S. Atty., Terry A. Zitek, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellant.

Jerome A. De Palma, Chicago, Ill, for defendant-appellee.

Before SPRECHER, TONE and WOOD, Circuit Judges.

SPRECHER, Circuit Judge.

In this appeal we uphold the validity of a warrantless search and seizure accomplished through a controlled delivery of narcotics.

## I

The facts are recited substantially as found by the district court. On March 16, 1979, defendant arrived at O'Hare International Airport in Chicago on a Continental Airlines flight from Los Angeles, California. She was unable to locate her luggage, and so she filed a Delayed Baggage Report with Continental. Thereupon, defendant left the airport.

The next day, Continental employees located the missing luggage, consisting of two suitcases and a golf bag. After an unsuccessful attempt to have the luggage delivered to the address listed in the report, followed by an equally abortive effort to contact defendant at the telephone number set forth therein,[1] the employees opened the smaller suitcase in the hope of finding some further means of contacting the defendant. In so doing, they were following what seems to have been Continental's normal operating procedure in such cases.[2]

In the course of searching the bag for identification, the Continental employees found 90.83 grams of cocaine inside several clear plastic bags contained in a manila envelope. When Continental's baggage service agent, Shava Judy Spector, arrived at work on March 18, she was informed that the bag had been searched and that drugs were found in it. She then examined the plastic bags herself and, believing them to contain heroin, she called the Drug Enforcement Administration (DEA).

In response to her call, Special Agent Thomas L. Thompson contacted her. When apprised of the facts, Thompson went to meet Spector at the airport.[3] Spector showed him the open suitcase, with the manila envelope lying on top. Thompson removed the plastic bags therefrom and, upon visual inspection, concluded that they contained cocaine. Beyond noticing the fact that the open suitcase also contained some type of clothing, Thompson had no personal knowledge of what else was in the open suitcase. In Thompson's presence another search of the defendant's three pieces of luggage was conducted by airline personnel.

Subsequently, someone called Spector's office regarding defendant's luggage. When informed that it had been found, the caller stated that he would come and pick it up.

After listening, with Spector's consent, to that call, Thompson summoned Special Agent Michael Hillebrand to the scene. By the time Hillebrand arrived at Spector's office, the smaller suitcase had been closed, with the substance tentatively identified as cocaine inside. Hillebrand had no personal knowledge of what that suitcase contained. However, Thompson and Spector had told him what they knew about the situation.

A few hours later, the defendant and a male companion arrived and claimed the luggage. The defendant signed for it, and picked up the smaller suitcase. Her companion took the other two pieces of her baggage. They then took different escalators down to the lower level of the terminal. When the defendant exited from the lower level and headed towards her companion's automobile, Hillebrand placed her under arrest and seized the luggage.

---

1. The delivery man could not deliver the bags because no one was home at the address and the neighbors refused to accept the bags because they said there had been a drug raid at the listed address. Tr. 130. The telephone listed in the report had been disconnected. Tr. 134.

2. The government, without objection by the defendant, advised us that the airline employ-

ees were following Civil Aeronautics Board Regulation No. 142, Rule 340(A)(1) which provides in part: "All baggage is subject to inspection by the carrier . . . ."

3. Before Thompson or any other DEA agent arrived, all three pieces of luggage had been examined by airline personnel. Tr. 121–22.

From the time the defendant informed the Continental employee working at the ticket counter that she was there to pick up her baggage until the moment of her arrest, she was under Hillebrand's continual surveillance. He observed that she did not open the suitcase during that time period.

Immediately after placing the defendant under arrest, Hillebrand conducted a quick weapons search of her purse and found none. Based upon the nature of defendant's clothing, he was satisfied that no patdown of her person would be necessary. He did not feel it necessary to search the smaller suitcase for weapons at that time, as he had seized it at the same instant that he arrested the defendant.

Having concluded that defendant was unarmed and not dangerous, Hillebrand took her to the airport DEA office. Once there, he opened the smaller suitcase and subjected it, along with her purse, to a thorough search. During this search, he found the cocaine and a "coke spoon" in the suitcase and another "coke spoon" in her purse. The cocaine was then subjected to a field test which yielded positive results.

The district court granted the defendant's motion to suppress the cocaine and the "coke spoon" taken from the suitcase. The government appealed.

## II

At the outset we are confronted with a question of jurisdiction. On July 24, 1979, the district court granted the defendant's motion to suppress the evidence, supported by a memorandum opinion. On August 9, the government filed its motion for reconsideration. On September 5, the court denied the government's motion, again supported by a memorandum opinion. The government's notice of appeal was filed on September 10, 1979.

The defendant has filed in this court a motion to dismiss the appeal as filed more than thirty days from July 24. The government responded and we ordered that the motion be taken with the case.

The right of the government to appeal from an order suppressing evidence is provided by 18 U.S.C. § 3731.[4] Both that section and Fed.R.App.P. 4(b)[5] fix the time for appeal at thirty days after the entry of the order.

The Supreme Court, applying 18 U.S.C. § 3731 and its own Rule 11(2), which fixed the time for appeal in criminal cases appealable directly from the district court to the Supreme Court, has held that if the government moves for a rehearing within the time fixed for taking an appeal, the motion terminates the running of the time for appeal

4. 18 U.S.C. § 3731 provides:

> In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.
>
> An appeal by the United States shall lie to a court of appeals from a decision or order of a district courts [sic] suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.
>
> The appeal in all such cases shall be taken within thirty days after the decision, judg-

> ment or order has been rendered and shall be diligently prosecuted.
>
> Pending the prosecution and determination of the appeal in the foregoing instances, the defendant shall be released in accordance with chapter 207 of this title.
>
> The provisions of this section shall be liberally construed to effectuate its purposes.

5. Fed.R.App.P. 4(b) provides in part:

> When an appeal by the government is authorized by statute, the notice of appeal shall be filed in the district court within 30 days after the entry of the judgment or order appealed from. A judgment or order is entered within the meaning of this subdivision when it is entered in the criminal docket. Upon a showing of excusable neglect the district court may, before or after the time has expired, with or without motion and notice, extend the time for filing a notice of appeal for a period not to exceed 30 days from the expiration of the time otherwise prescribed by this subdivision.

and the time begins to run anew from the date of the entry of the order disposing of the motion. *United States v. Healy*, 376 U.S. 75, 77–80, 84 S.Ct. 553, 554–556, 11 L.Ed.2d 527 (1964). See also 9 Moore's Federal Practice, ¶ 204.17, at 991–92 (2d ed. 1975).

Some doubt as to whether the same principle would apply when the criminal case was appealed from the district court to a court of appeals, subject to Fed.R.App.P. 4(b) instead of Supreme Court Rule 11(2), was dispelled in *United States v. Dieter*, 429 U.S. 6, 97 S.Ct. 18, 50 L.Ed.2d 8 (1976), when the Court said:

> The Court of Appeals misconceived the basis of our decision in *Healy*. We noted there that the consistent practice in civil and criminal cases alike has been to treat timely petitions for rehearing as rendering the original judgment nonfinal for purposes of appeal for as long as the petition is pending. 376 U.S., at 78–79, 84 S.Ct. at 555–556. To have held otherwise might have prolonged litigation and unnecessarily burdened this Court, since plenary consideration of an issue by an appellate court ordinarily requires more time than is required for disposition by a trial court of a petition for rehearing. *Id.*, at 80, 84 S.Ct. at 556. The fact that appeals are now routed to the courts of appeals does not affect the wisdom of giving district courts the opportunity promptly to correct their own alleged errors, and we must likewise be wary of imposing added and unnecessary burdens on the courts of appeal.

*Id.* at 8, 97 S.Ct. at 19 [footnote omitted].

The defendant seems to have placed some significance on the fact that the granting of the motion to suppress is "interlocutory."

She argues that an appeal from such an order should be expedited. While it is true that both *Healy* and *Dieter* involved orders dismissing an indictment, 18 U.S.C. § 3731 gives the government the right to appeal both from orders dismissing indictments and from orders suppressing evidence. Section 3731 provides, as to both appeals, that they "shall be diligently prosecuted." Nevertheless, the Supreme Court approved the possibility of lengthier appeals in favor of giving the district courts the first opportunity to correct their own alleged errors. In addition, many dismissals of indictments are the direct result of suppressions of evidence.[6] Finally, the *Dieter* result was anticipated in *United States v. St. Laurent*, 521 F.2d 506, 511–12 (1st Cir. 1975), *cert. denied*, 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976), where the appeal, like this one, was from the granting of a motion to suppress evidence.

The notice of appeal by the government was timely filed.

### III

The district court based its suppression of the evidence primarily upon *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) and *United States v. Berry*, 560 F.2d 861 (7th Cir. 1977), *vacated on other grounds*, 571 F.2d 2 (7th Cir.), *cert. denied*, 439 U.S. 840, 99 S.Ct. 129, 58 L.Ed.2d 138 (1978). The court concluded that the warrantless search of the luggage which occurred after the defendant's arrest violated the Fourth Amendment under the authority of those cases.[7] Except for the facts that *Sanders* involved luggage and *Berry* involved an attache case, the two cases bear little factual resemblance to the present case,[8] which involves luggage but

---

**6.** In *Dieter*, the "District Court . . . reconsidered the . . . motion to suppress, and . . . dismissed the indictment." 429 U.S. at 6–7, 97 S.Ct. at 18.

**7.** Inasmuch as the court found the post-arrest search unconstitutional, it assumed, without deciding, that the prior search made by airport personnel in the presence of a DEA agent was permissible and that the earlier search provided probable cause to believe that the smaller suitcase contained contraband.

**8.** In addition, *Berry* was vacated when we determined that *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), would not be applied retroactively in this circuit. Likewise, the searches involved here took place on March 16–18, 1979 and *Sanders* was decided on June 20, 1979, so that it would require retroactive application of *Sanders* in order to apply it here. However, for the purposes of this case, we assume that both *Chadwick* and *Sanders* apply.

also involves an earlier private search by nongovernmental persons and a "controlled delivery" by the government to the defendant.

Even as "[t]he word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears," *Coolidge v. New Hampshire*, 403 U.S. 443, 461–62, 91 S.Ct. 2022, 2035, 29 L.Ed.2d 564 (1971), we do not believe that the Supreme Court in *Sanders*, in which it recognized that "the circumstances giving rise to suppression requests can vary almost infinitely," intended that the word "luggage" would automatically require suppression to the exclusion of all other prior teaching surrounding the application of the Fourth Amendment. *Sanders, supra,* 442 U.S. at 757, 99 S.Ct. at 2589.

Controlled deliveries of contraband apparently serve a useful function in law enforcement. They most ordinarily occur when a carrier, usually an airline, unexpectedly discovers what seems to be contraband while inspecting luggage to learn the identity of its owner, or when the contraband falls out of a broken or damaged piece of luggage, or when the carrier exercises its inspection privilege because some suspicious circumstance has caused it concern that it may unwittingly be transporting contraband. Frequently, after such a discovery, law enforcement agents restore the contraband to its container, then close or reseal the container, and authorize the carrier to deliver the container to its owner. When the owner appears to take delivery he is arrested and the container with the contraband is seized and then searched a second time for the contraband known to be there.

In this case, about four hours elapsed between the time of the government agent's awareness of the contraband until the suitcase containing it was picked up by the defendant. As we said in *United States v. Issod,* 508 F.2d 990 (7th Cir. 1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1578, 43 L.Ed.2d 783 (1975):

During the 22-hour period the boxes were under the federal agents' surveillance or control in Wisconsin before defendant and his companion arrived to take delivery, the agents could have obtained a warrant to search and seize the boxes. They could not, however, have obtained a warrant to arrest the person who would claim the boxes or to search the vehicle into which the boxes would be loaded, because they could not satisfy the Fourth Amendment's requirement of an affidavit "particularly describing the place to be searched, and the person . . . to be seized" until those persons arrived to pick up the boxes. See *Lowrey v. United States,* 161 F.2d 30, 33 (8th Cir. 1947), *cert. denied,* 331 U.S. 849, 67 S.Ct. 1737, 91 L.Ed. 1858 (1947).

*Id.* at 993.

The district court here assumed that the government agents could have seized the cocaine and the suitcase in which it was transported before it was returned to the defendant, but that the second seizure and search required a warrant to satisfy the Fourth Amendment.

Several other circuits have taken a different view of controlled deliveries. In *United States v. Ford,* 525 F.2d 1308 (10th Cir. 1975), the court said:

Realistically, the contraband was seized by the officers in California before it was ever shipped to Oklahoma. See *United States v. DeBerry,* 487 F.2d 448 (2d Cir. 1973). The California officers marked the package and placed a business card inside it. Upon receiving assurances of cooperation from Oklahoma City officers, they authorized its shipment. This action constituted the initial act of control and dominion over the contraband, for without government authorization the airline officials could not have shipped the contraband. This official dominion continued unbroken because close surveillance followed the seized contraband, insuring

that it remained within official possession. Actual physical control was in fact reasserted by the Oklahoma City police when the arrest process was completed. These material facts are indistinguishable from *DeBerry*, supra, and we adopt the analysis of that case in concluding that the official seizure of the contraband occurred in San Francisco when the government asserted dominion over it. The seizure must be judged against the Fourth Amendment as of that time and place.

Certainly, the seizure meets the Fourth Amendment requirement of probable cause, because the government agents involved knew that the substance was contraband before seizing it. But, the officers' failure to obtain a warrant to seize can be excused only if the circumstances at the time of the seizure were sufficiently exigent to make their course of action imperative. See *Coolidge*, supra. We believe that such circumstances existed here. The California officers had determined with certainty—and without violation of privacy—that the substance submitted for shipment was contraband. At that time, they could have ordered that the substance be detained until a magistrate could issue a warrant to seize it. The time delay required to obtain a warrant, however, might very well have warned the parties to the crime of the government's presence and prevented their apprehension. If the contraband had not been shipped immediately, the Oklahoma City addressee probably would have become suspicious and remained aloof, and the officers' investigation and arrest process would have proven unproductive. See also cases cited in *Issod*, supra, at 993. In these circumstances we think the California officers' actions in seizing the package were reasonable and necessary. No warrant to seize was required here.

The search was private, and the ensuing warrantless seizure was made upon probable cause under exigent circumstances. Neither the search nor the seizure violated appellant's Fourth Amendment rights.

*Id.* at 1312–13.

In *United States v. DeBerry*, 487 F.2d 448 (2d Cir. 1973), the court said:

It may be argued that the New York seizure was separate and distinct from the California search, and because there was ample opportunity for the New York officers to obtain a warrant for the suitcases's seizure, its warrantless seizure violated the fourth amendment. *See Coolidge v. New Hampshire*, 403 U.S. 443, 470–471, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). This, however, would ignore the facts and realities of the situation. The suitcase was seized initially in California by Sergeant Figelsky of the Los Angeles Police Department. That seizure although done without warrant was legal, because Emery's legal inspection in effect put the marijuana in Figelsky's plain view; he, therefore, could seize the contraband upon sight. *Cf. United States v. Riggs*, 474 F.2d 699 (2d Cir. 1973), cert. denied, 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973). Figelsky made the seizure by removing one of the bricks of marijuana, marking all the rest of the bricks with his initials, and finally marking the suitcase itself with his initials. He then authorized the suitcase to be shipped on. Even though the suitcase was then in transit, later in the luggage bin, and later still in the freight room, it remained legally "seized" just as much as if it were under the actual physical control of the police. In fact, except for the time that it was actually in the airplane's belly, it was under the close surveillance of the police. Thus, when the agents and police in New York removed the bag from the back seat of the car appellants were in, they were not making an initial seizure, but rather were merely reasserting control of the suitcase which had already been seized for legal purposes and which was merely being used as bait. Accordingly, no warrant was required.

*Id.* at 450–51 [footnotes omitted]. See also *United States v. Blanton*, 479 F.2d 327, 328

(5th Cir. 1973) ("events which later transpired did not constitute a separate or additional search"); *United States v. Emery*, 541 F.2d 887, 890 (1st Cir. 1976) ("inserting the beeper into . . . contraband . . legitimately discovered and constructively seized at the border . . . did not violate" Fourth Amendment).

 Where, as here, the suitcase with the contraband was never out of the sight of the DEA agents, the marking of the contraband, as done in *Ford* and *DeBerry*, where the contraband was shipped to different states, was not necessary to create the legitimate constructive seizure. In *Issod, supra*, it was not necessary to rely upon a constructive seizure because the second search was believed to have qualified as an automobile search governed by *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) and now changed as to that aspect by *Arkansas v. Sanders, supra*. However, the remaining principles of *Issod* are not affected by *Sanders*.

The district court held that although the first private search wherein the presence of contraband was discovered was permissible and although there were reasons for not seeking a warrant until the defendant and her companion arrived at the airport at which time it was too late for a warrant, and although there was probable cause for the arrest and seizure, nevertheless the final search required a warrant. We hold that the first seizure followed by the controlled delivery created a constructive seizure which validated the second search.

### IV

Inasmuch as the district court presumed without deciding that the earlier search made by airport personnel in the presence of the DEA agent was proper and that the earlier search provided the government with probable cause to believe that the suitcase contained contraband, we must consider and determine these questions.

The first search of the defendant's luggage was conducted by airport personnel prior to the DEA's involvement in any way. This search was a private search not protected by the Fourth Amendment. *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *United States v. Issod*, 508 F.2d 990, 994 (7th Cir. 1974), cert. denied, 421 U.S. 916, 95 S.Ct. 1578, 43 L.Ed.2d 783 (1975).

Thereafter, the DEA agent arrived at the airport[9] and a second search was undertaken by airport personnel in the agent's presence. The reopening and reinspection of the contents of a container by or in the presence of government authorities following a private search of the same container does not constitute a separate, independent search requiring a warrant. *United States v. Sanders*, 592 F.2d 788, 794 (5th Cir. 1979), cert. granted, 444 U.S. 914, 100 S.Ct. 227, 62 L.Ed.2d 168 (1979); *United States v. McDaniel*, 574 F.2d 1224, 1226–27 (5th Cir. 1978), cert. denied, 441 U.S. 952, 99 S.Ct. 2181, 60 L.Ed.2d 1057 (1979); *United States v. Pryba*, 502 F.2d 391, 401 (D.C. Cir. 1974), cert. denied, 419 U.S. 1127, 95 S.Ct. 815, 42 L.Ed.2d 828 (1975); *United States v. Blanton*, 479 F.2d 327, 328 (5th Cir. 1973).

The discovery of what an experienced narcotics agent concluded to be cocaine gave the DEA probable cause to arrest the defendant. The experienced agent testified that he had identified cocaine previously "hundreds of times" and that "[t]here was no question in my mind, I thought it was cocaine."

The judgment is reversed and remanded for further proceedings.

---

**9.** When the DEA agent arrived at the airport, airport personnel showed him the smaller suitcase lying open on a desk. Resting on top of some women's clothing in the open suitcase was a plain unsealed manila envelope. The agent looked inside the envelope and saw seven clear plastic bags containing a white powdery substance, which, on the basis of his having seen cocaine hundreds of times, he concluded was cocaine. Tr. 11–13.