[Crim. No. 4230. Fifth Dist. Oct. 30, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT LAWRENCE RIEGLER, Defendant and Appellant.

COUNSEL

Eugene Seltzer for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Roger E. Venturi , Shirley Nelson and Ramon M. de la Guardia, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

HOPPER, J.—In this case we consider the applicability of the container decisions to wrapped and sealed packages arriving by overseas mail which are opened by customs officials, resealed, delivered in a controlled delivery with a search warrant for the residence of the addressee, seized in a vehicle approximately 100 miles from that residence, returned to the city of the addressee, and subsequently opened by law enforcement officers without first obtaining a search warrant to open the packages. We conclude that while the seizure was proper, the warrantless search was not.

In the instant case Riegler pled guilty to a charge of possession of marijuana for sale after his motion to suppress was denied. He appeals asserting error in denial of the suppression motion.

The facts are these:

On November 8, 1977, a customs inspector at JFK Airport in New York City notified John Huber, a special agent with the Drug Enforce-

ment Administration, that a detector dog had alerted the inspector to two packages sent from Germany and when the inspector opened them up he observed what he believed to be hashish.

Chemical analysis confirmed that the substance was hashish.

The packages were addressed to Selma and Mike Fortner, 1130 W Street, Merced, California.

The packages were resealed by the customs agent and Huber sent the packages to Patrick Dorn, a United States postal inspector in Fresno who received them on November 21, 1977.

Dorn brought the packages to Merced and contacted a Lieutenant Moore who was in charge of specialized manpower assigned to crime control (SMACC) in Merced County. Huber also had contacted Moore on November 21, 1977, and told him about the packages.

The plan was to have a controlled delivery and Agent Atkins with SMACC obtained a search warrant on November 22, 1977, for the premises at 1130 W Street.

On November 22d, Lieutenant Moore and other agents took up surveillance at the Fortner residence. At approximately 1:30 Dorn gave the parcels to the regular mail carrier who delivered the parcels at approximately 1:40 and Michael Fortner took them.

About 10 to 15 minutes after the delivery of the packages a red Volkswagen pulled into the driveway at the Fortner residence.

Lieutenant Moore testified that between 1:40 and 2:11, when Riegler drove the Volkswagen away with the packages, nothing prevented Moore from going into the residence to execute the warrant. He did not immediately serve the warrant because he wanted to wait for the occupants to have time to open the package. He was also interested in where the hashish was going if it left the residence. He wanted to ascertain who else was involved in the case and whether he could arrest more people. He would follow suspects wherever they went, including on a plane.

Before the vehicle left, the packages were placed in the Volkswagen but a SMACC agent could not tell if both packages were put in.

After the Volkswagen left, the warrant was executed and served on Mike Fortner at 2:30, and the house searched, but nothing incriminating was found. Agent Austin overheard Michael Fortner on the phone say that a couple of packages came for Bob and "I gave them both to Bob."

The search warrant was apparently restricted to the premises, structures, rooms and receptacles of the Fortner residence at 1130 W Street, Merced, and did not provide for the search of any vehicle or persons.

When the vehicle left the Fortner residence SMACC agents including Moore, along with Postal Inspector Dorn, followed. Although several opportunities existed to detain the occupants, the officers chose not to do so until approximately 4:05 p.m., at which time the vehicle was stopped in Contra Costa County approximately 100 miles from the Fortner residence. The reason for the stop then was the fear of losing surveillance in East Bay traffic.

Riegler and a codefendant (Bannister) exited the vehicle and were arrested. Moore observed two packages in the back seat of the Volkswagen. The packages were identified as being the same ones previously seized, opened, rewrapped and delivered. The packages did not appear to have been opened after delivery to the Fortner residence. The seized packages were taken to the SMACC office in Merced where they were photographed and opened and found to contain hashish valued at approximately $100,000. No search warrant was obtained before the opening. Moore testified that when he took the packages back to the Merced office, he had no fear that something would happen to the packages.

Relying on *United States* v. *Chadwick* (1977) 433 U.S. 1 [53 L.Ed.2d 538, 97 S.Ct. 2476], *People* v. *Minjares* (1979) 24 Cal.3d 410 [153 Cal.Rptr. 224, 591 P.2d 514], and their progeny of container cases, Riegler asserts that a search warrant for the packages should have been obtained before the packages were opened in Merced. We agree.

We reject the contention that Riegler had a lesser expectation of privacy in the packages on the theory that the packages were initially

subject to customs search. The packages were securely wrapped and sealed with no labels or markings to indicate the character of their contents. As the United States Supreme Court said in *Walter v. United States* (1980) 447 U.S. 649, 658, footnote 12 [65 L.Ed.2d 410, 419, 100 S.Ct. 2395, 2402] (lead opinion):[1] "...it is difficult to understand how petitioner's subjective expectation of privacy could have been altered in any way by the subsequent events of which they were obviously unaware."

At the very least in this case there was an expectation that when the packages arrived at the Merced address the contents would remain private. The partial invasion of privacy by customs did not automatically justify a total invasion. In the words of *Walter* (447 U.S. 649, 659, [65 L.Ed.2d 410, 419, 100 S.Ct. 2395, 2403]): "It did not simply strip the remaining unfrustrated portion of [the] expectation of all Fourth Amendment protection." (Fn. omitted.)

Of course, the expectation of privacy means more than a subjective expectation. The expectation must be reasonable. Under the present standards enunciated in *Chadwick, Sanders, Minjares, Dalton* (*United States v. Chadwick, supra,* 433 U.S. 1; *Arkansas v. Sanders* (1979) 442 U.S. 753 [61 L.Ed.2d 235, 99 S.Ct. 2586]; *People v. Minjares, supra,* 24 Cal.3d 410; *People v. Dalton* (1979) 24 Cal.3d 850 [157 Cal. Rptr. 497, 598 P.2d 467]) and their respective progeny, we cannot say that the expectation here was unreasonable. Under the factual circumstances present in this case, we conclude there was a justifiable expectation of privacy against unwarranted intrusion. Essentially an important element in these cases is foreseeability which is implicit in an

---

[1]*Walter* was a five-to-four opinion. In *Walter* there had been an interstate shipment of several secured sealed packages containing eight-millimeter films apparently depicting homosexual activities. This shipment was mistakenly delivered by a private carrier to a third party rather than the consignee. Employees of the third party opened each of the packages. Inside were individual film boxes on one side of which were suggestive drawings and on the other explicit descriptions of the contents. The Federal Bureau of Investigation was notified and picked up the packages. The films were viewed with a projector without first obtaining a warrant. Mr. Justice Stevens joined by Mr. Justice Stewart concluded that the government's unauthorized screening of the films without a warrant violated the Fourth Amendment. Mr. Justice White joined by Mr. Justice Brennan concurred but also held that the subsequent screening by the government was an independent governmental search without regard to the previous private screening and agreed that even if the private parties had projected the films before turning them over to the government, the government still would have been required to obtain a warrant for its subsequent screening of them. (See conc. opn. 447 U.S. at p. 661 [65 L.Ed.2d at pp. 420-421, 100 S.Ct. at p. 2404].)

analysis of subjective expectations. Here, the government should have anticipated a reasonable claim of privacy. (See *United States* v. *Rivera* (N.D.Tex. 1980) 486 F.Supp. 1025, 1034.)

Rather than placing on the law enforcement officer on the street the difficult, if not impossible burden, of carrying a list of "searchable parcels," we believe that the standard to be followed by the officer is the one which was succinctly stated by federal Judge Higginbotham in *Rivera, supra, idem.* as follows: "...[I]f the contents of a sealed package or parcel are not revealed by the package and you have exclusive control with no fear of harm from its contents—*obtain a warrant.*" (Italics added.)

The packages were no longer subject to a warrantless search once they were delivered. (See *People* v. *Whyte* (1979) 90 Cal.App.3d 235 [152 Cal.Rptr. 280]; but see *United States* v. *Bulgier* (7th Cir. 1980) 618 F.2d 472.) This is particularly true when as here considerable time had passed and the packages had been transported such a distance by the recipients or others. Not only had a considerable period passed from the time the vehicle left Merced and was finally stopped and the packages seized, but additional time (some four to five hours) also passed after the seizure of the packages and their subsequent opening at Merced.

The Attorney General argues that the warrant obtained for the house should be adequate to authorize the opening of the sealed packages. We are not persuaded. The warrant which was obtained did not authorize (and properly could not so authorize under the Fourth Amendment) seizure of the packages *at any place where found.*

Nor do we believe that the police were entitled to search the seized packages without a warrant because "their contents can be inferred from their outward appearance." (*Arkansas* v. *Sanders, supra*, 442 U.S. at pp. 764-765 [61 L.Ed.2d at p. 245, 99 S.Ct. at p. 2593, fn. 13].[2]) The fact that the police had ample probable cause to believe and perhaps even *knew* that the packages contained contraband does not mean their contents were apparent from the outside.

---

[2]The footnote reads: "Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. *Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance.* Similarly, in some cases the contents of a

The meaning of the somewhat cryptic[3] footnote in *Sanders* need not concern us in this case. This is factually *not* a situation where the packages "by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance."

The vehicle here was properly stopped and the packages were properly seized. However, the fact that the packages were lawfully seized does not validate a warrantless search of the contents. While there was ample probable cause for the police officer's belief that the packages contained contraband, there were no exigent circumstances justifying the failure to secure a warrant for the search of those packages.

Some may consider the warrant requirement to be unnecessary surplusage in this situation. ■ However, "a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" (*Mincey v. Arizona* (1978) 437 U.S. 385, 393 [57 L.Ed.2d 290, 300, 98 S.Ct. 2408].) As the California Supreme Court said in *People v. Minjares, supra*, 24 Cal.3d 410, 420-421: "When those circumstances cease to exist the exception also ceases to exist and a warrant must be obtained. This is the rationale of *Chadwick*: 'Even though on this record the issuance of a warrant by a judicial officer was reasonably predictable, a line must be drawn. In our view, *when no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority.*' ([Citation], italics added.) To hold otherwise would exalt the exceptions above the rule." (Fn. omitted.)

■ The same viewpoint is set forth by our Supreme Court in *People v. Dalton, supra*, 24 Cal.3d 850, 860: "The warrant requirement is not an empty formality. It is the cornerstone of the Fourth Amendment's guarantee of the right to privacy. The assurance that a determination of probable cause will be made by a neutral and detached magistrate,

---

package will be open to 'plain view' thereby obviating the need for a warrant. [Citation.] There will be difficulties in determining which parcels taken from an automobile require a warrant for their search and which do not." (Italics added.)

[3]It is not clear from the *Sanders* footnote whether or not the United States Supreme Court in the italicized sentence (see fn. 2, *ante*) is really making an exception to the requirement of a warrant substantially different from the "plain view" exception. Perhaps, it is merely an extension of the "plain view" exception.

rather than an officer under stress in the field is not a minor guarantee. [Citation.] The authority of the executing officer and his need to search are carefully reviewed. [Citation.] Limits are imposed on the search through the requirement of particularity. [Citation.] And the factual basis on which the affiant is justifying the search is made in advance of the search itself. This ensures that a search will not be impermissibly justified by what it turns up. [Citation.] These important protections would be undermined by the adoption of a rule that would encourage officers to conduct a search at the time of the seizure of personal effects, rather than requiring them to obtain a warrant. [Citations.]"[4]

In examining the record in this case, we find no exigent circumstances that would authorize a warrantless search of the packages. The motion to suppress should have been granted. Whether or not there remains sufficient evidence to retry Riegler is a matter initially for the prosecution, and we express no opinion thereon at this time.

The Attorney General argues that the suggested procedure in *People v. Haybron* (1980) 108 Cal.App.3d 31, 40, footnote 2 [166 Cal.Rptr. 264], should be applied here and the container could be brought into court and then opened under judicial authorization. That suggested procedure was completely unnecessary to the decision in *Haybron*. Additionally *Haybron* arose in a Penal Code section 995 setting and the court concluded at page 40 that even in the absence of the evidence ob-

---

[4]One of the citations in *Dalton* is to the United States Supreme Court opinion in *Johnson* v. *United States* (1948) 333 U.S. 10, 13-14 [92 L.Ed. 436, 440, 68 S.Ct. 367]. While that quote has been often set forth in full (see, for example, *Chapman* v. *United States* (1961) 365 U.S. 610, 614-615 [5 L.Ed.2d 828, 832, 81 S.Ct. 776]), the statement written by Mr. Justice Jackson over 32 years ago still bears repeating in full. It reads: "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." (Fn. omitted.)

tained via the warrantless search there was probable cause to hold the defendants to answer. Furthermore, the suggested procedure does not consider the facts of the Fourth Amendment violation. The thrust of the container cases is to prevent warrantless searches. The *Haybron* procedure, in effect, would turn the rule on its head and circumvent the Fourth Amendment violation. We reject the use of such a procedure in this case.

In light of our conclusion we need not consider any other contention of error made by Riegler.

The judgment is reversed.

Brown (G. A.), P. J., concurred.

ANDREEN, J.—I concur because of the authority of *People* v. *Whyte* (1979) 90 Cal.App.3d 235 [152 Cal.Rptr. 280], but write to express a question as to the wisdom of the law stated therein.

The majority in this case holds that the seizure of the packages was proper, but that a subsequent search of the contents could only follow the issuance of an additional warrant. The People's argument that defendant had a lesser expectation of privacy because the packages were subject to a customs search is rejected. It is difficult to understand why. Once it was determined that the material was contraband, the packages could move through the United States mail only by virtue of governmental authorization.

If it were not for *Whyte*, I would argue that the packages were in the constructive possession of law enforcement from the time of the opening of them at JFK Airport until the stop in Contra Costa County. For an example of this approach, see *United States* v. *DeBerry* (2d Cir. 1973) 487 F.2d 448. It is recognized that the argument for constructive possession is weakened once there was a delivery of the material to the Fortner residence in Merced. The problem is not insurmountable, however, if one remembers that the authorities had a right to immediate seizure of the packages. They delayed that act in a commendable attempt to increase the size of their catch, but their immediate right to possession gave them continued constructive control.

I think that the approach in *DeBerry* would simplify the task of law enforcement without derogating from the values protected by the

Fourth Amendment's prohibition of unreasonable searches and seizures.[1]

A petition for a rehearing was denied November 25, 1980, Andreen, J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied December 24, 1980. Mosk, J., Clark, J., and Richardson, J., were of the opinion that the petition should be granted.

The United States Supreme Court (*California* v. *Riegler* (1981) 453 U.S. 919 [69 L.Ed.2d 1001, 101 S.Ct. 3153]) ordered the judgment vacated and remanded the cause to the Court of Appeal, Fifth Appellate District, for further consideration in light of *New York* v. *Belton* (1981) 453 U.S. 454 [69 L.Ed.2d 768, 101 S.Ct. 2860]. For subsequent opinion see *People* v. *Riegler* (1981) 127 Cal.App.3d 317 [179 Cal.Rptr. 530].

---

[1] """My basic premise is that Fourth Amendment doctrine, given force and effect by the exclusionary rule, is primarily intended to regulate the police in their day-to-day activities and thus ought to be expressed in terms that are readily applicable by the police in the context of the law enforcement activities in which they are necessarily engaged. A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions, may be the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but they may be 'literally impossible of application by the officer in the field.'"' LaFave, 'Case-by-Case Adjudication' versus 'Standardized Procedures': The Robinson Dilemma, 1974 Sup.Ct.Rev. 127, 141 (footnotes omitted), quoting *United States* v. *Robinson*, 153 U.S.App.D.C. 114, 154, 471 F.2d 1082, 1122 (1972) (dissenting opinion), rev'd 414 U.S. 218, (1973)." (*United States* v. *Chadwick* (1977) 433 U.S. 1, 22, fn. 3 (dis. opn. of Blackmun, J.) [53 L.Ed.2d 538, 555, 97 S.Ct. 2476].)